**UNITED STATES RUBBER COMPANY and Walter J. Reinhard, Plaintiffs,**

v.

**CONSOLIDATED TRIMMING CORPORATION, Defendant.**

United States District Court
S. D. New York.
June 13, 1963.

Arthur, Dry, Kalish, Taylor & Wood, New York City, for plaintiffs; Arthur L. Whinston, and Harvey E. Bumgardner, Jr., New York City, of counsel.

Baer, Marks, Friedman & Berliner, New York City, for defendant; Leonard L. Kalish, Philadelphia, Pa., of counsel.

FEINBERG, District Judge.

This is an action under 28 U.S.C. § 1338(a), alleging infringement of two patents covering carpet-seaming tapes. The first of these patents was issued to Walter J. Reinhard, a plaintiff in this action. The other plaintiff, United States Rubber Company ("U.S. Rubber"), acquired the rights to the second patent by assignment from the alleged inventor, Paul D. Wright. Defendant is Consolidated Trimming Corporation ("Consolidated"), a New York corporation, having its principal place of business in Manhattan. The litigation has spawned a number of legal and factual issues.[1] For reasons indicated below, the patents are held invalid, and resolution of most of the other legal issues raised is there-

---

1. The record of the trial consumed over 3,000 pages of transcript.

fore unnecessary. However, the facts bearing on these issues will be set forth.

## I

Carpet-seaming tape is a device for joining together pieces of carpet eliminating the need of sewing the pieces together. Defendant Consolidated's allegedly infringing tape [2] consists of a strip of brown crepe paper about four inches wide, with white crosswise threads of yarn fabric three inches wide longitudinally stitched on the crepe paper.

There are two ways of using carpet-seaming tape—face-seaming and back-seaming.[3] Defendant's tape is used only in face-seaming. This method can be done either on the job or in a workroom, in the following manner: the carpet strips to be joined are placed on the floor face up in the ordinary manner; the abutting edges of the carpet are then rolled back and the carpet-seaming tape is placed on the floor with the fabric portion face up to cover the area immediately underneath the imaginary line where the carpet strips will abut; adhesive is applied to the tape and then the rolled back edges of the two abutting carpets are allowed to fall back into place next to each other and on to the tape; both edges are tacked into place until the tape has dried onto the back of both carpet strips. The result is that the carpet strips are then securely joined.

The other method of using carpet-seaming tape, back-seaming, is done only in a carpet workroom in the following way: the two strips of carpet to be joined are laid face down, instead of face up, with the edges next to each other, and they are tacked down; adhesive is then spread on the carpet back where the edges abut, and a strip of fabric or other material is placed on top of the adhesive-coated abutting portions of carpet. Another coat of adhesive may then be spread over the fabric tape. The adhesive dries firmly joining the edges together.[4]

Joining carpet sections together by adhesively securing a strip of fabric or other material to the backs of two abutting pieces of carpet was a common practice by 1934,[5] and this idea was the subject of a patent issued in 1932.[6] At that time, it was also common practice when face-seaming to place some sort of paper underneath the fabric tape to which adhesive was to be applied in order to protect the floor or underlay from adhesive spillage. Sometimes this paper was ordinary newspaper; other times it was a roll of paper five or six inches wide, recommended by the seller of the fabric tape to be used with the tape.[7] The paper, however, was not pre-joined to the fabric but was a separate item. Use of paper to protect the floor was not necessary in back-seaming. In this method, the carpet was placed face down and adhesive was applied to the fabric tape on the back of the carpet; therefore, there was no need to protect the floor.

In 1946, plaintiff Reinhard became associated with the Naugatuck Chemical Division of plaintiff U. S. Rubber as a commission salesman of latex adhesive used to strengthen carpet seams when carpets are sewn together. In selling this product, Reinhard called on retail carpet dealers, independent carpet workrooms (which install carpets for dealers who do not have their own workrooms), and rug cleaners.[8] In this period, U. S. Rubber cautioned Reinhard not to sell any adhesive for use in tape-seaming

2. E. g., Plaintiffs' Exhibit 91A [Plaintiffs' Exhibit hereinafter cited as "Pl. Ex."].

3. See Transcript, pp. 972–76 [Transcript hereinafter cited as "Tr."]; Defendant's Exhibit 11, pp. 9–10 [Defendant's Exhibit hereinafter cited as "Def. Ex."].

4. See Tr. pp. 79–80, 369; Def. Ex. 11, pp. 4–7.

5. Tr. pp. 970–71. Plaintiff Reinhard acknowledged his familiarity with this prior carpet-seaming practice. See Tr. pp. 2169–73.

6. U. S. Patent No. 1,842,746 ("the Chance patent"), issued on January 26, 1932, to P. H. Chance; Def. Ex. 13.

7. Def. Ex. 4; Tr. pp. 973–76.

8. Tr. pp. 68–74.

500

because this might infringe the Chance patent.[9]

In late 1948 or early 1949, Reinhard conceived the idea of patenting a carpet-seaming tape of his own. Accordingly, Reinhard filed an application with the United States Patent Office on May 7, 1949, which patent was later issued on May 8, 1951, as No. 2,552,114 ("the first Reinhard patent").[10] As indicated below, this patent is not being contested here. The patented tape, described in greater detail below,[11] consisted of a fabric portion with metal grippers and, preferably, a paper backing already adhesively joined to the fabric when the tape came to the user of the product.

After applying for this patent, Reinhard attempted to improve his product by substituting a crepe paper backing for the plain paper backing envisaged in his application. On December 8, 1949, Reinhard demonstrated this changed form of his carpet-seaming tape at a convention of carpet distributors in New York City. At least one distributor there gave him an order for the tape, although there was no price for the product because there was no machine to make it.[12] In July 1950, Reinhard again demonstrated the still handmade tape at a carpet convention, and several orders were given him there.[13] In December 1950, a machine for manufacturing the tape was completed, and for the first time orders already received for tape were filled.[14] The order taken in December 1949 was filled by a shipment in January 1951.[15]

On December 13, 1950, Reinhard applied for his second carpet-seaming tape patent. This patent was ultimately is-

sued to him as No. 2,647,850 on August 4, 1953 ("the second Reinhard patent").[16] The validity of claims one and three of this patent is one of the chief issues in this litigation. The physical features distinguishing this patent from the first Reinhard patent are the use of crepe paper instead of plain paper as a backing on the tape and the absence of metal grippers.

After filing his application for each of his patents, Reinhard licensed them to U. S. Rubber,[17] for whom he continued to work as a commission salesman. Reinhard's carpet-seaming tape of fabric adhesively secured to crepe paper was sold in two versions: one with metal grippers incorporated into it, called "Kwik-Grip," and exactly the same tape without the grippers, called "Rug Sealz."[18] The latter tape was not sold until March 1953. It was introduced then because of the appearance on the market of thin-backed carpets, which were so thin that the grippers on Kwik-Grip tape would penetrate the backing into the carpet itself.[19]

The second patent forming the basis of plaintiffs' suit was allegedly invented by Paul D. Wright. In 1953, Wright was in the purchasing department of the Naugatuck Chemical Division of U. S. Rubber, and, at Reinhard's request, he engaged in cost reduction studies on Rug Sealz tape.[20] Around November 5, 1953, Kenneth B. Milnes of the Bond Narrow Fabic Company visited Wright at Naugatuck in an attempt to sell narrow fabrics to U. S. Rubber.[21] At that meeting or at a subsequent meeting shortly thereafter, Milnes showed Wright samples of binding tapes that he had

9. Tr. pp. 557–59, 2170–72.

10. Pl. Ex. 5.

11. See text accompanying notes 56–58 infra.

12. Tr. pp. 108–11.

13. Tr. pp. 136–38; cf. Pl. Ex. 14.

14. Tr. pp. 157–60.

15. Tr. p. 161.

16. Pl. Ex. 18.

17. Pl. Exs. 15, 23; Tr. pp. 140, 162–63.

18. Tr. p. 149.

19. Tr. pp. 169–71.

20. Tr. pp. 181–82.

21. See Plaintiffs' Proposed Findings of Fact and Conclusions of Law [hereinafter cited as "Pl. Prop. Find."], Nos. 114–15, agreed to by defendant. Tr. pp. 1819–20.

developed over the years, which he called his "Bindex" tapes. Wright gave Milnes a sample of Rug Sealz tape and asked him to help develop a new Rug Sealz tape.[22] According to Milnes, Wright suggested various materials to be used.[23] Wright also suggested the idea of using untwisted weft yarns.[24] On December 14, 1953, Milnes brought samples to Wright which he had made up.[25] All of these samples were subsequently shown to Reinhard, and he chose one which later became the basis of an altered version of Rug Sealz tape.[26]

Milnes' Bindex tapes were constructed by knitting continuous weft (widthwise) yarns on to a backing of another material in a series of longitudinal stitches. This is the same principle of construction used by Milnes in making samples for Wright and later used in the altered Rug Sealz tape.[27] The chief differences between this new Rug Sealz tape made by Milnes for U. S. Rubber, which is still sold today, and the old version are: the new tape contains continuous wholly untwisted weft yarns only, while the old utilized both weft and warp yarns in the form of a fabric; in the new tape, the yarns are stitched on to the crepe paper backing while in the old, the yarns were merely adhered to the paper.

In 1954, shortly before the filing of Wright's patent application, Milnes was called to Naugatuck in connection with that application. At that time, the U.S. Rubber attorney who handled Wright's application asked Milnes to describe the method of manufacturing the tape, apparently in order to assist him in preparing the application.[28] Milnes did not want U. S. Rubber to know the details of the tape's construction,[29] so he described the construction only vaguely. As a result, the patent application does not accurately describe the method that was actually being used to manufacture the article being patented.[30] Although plaintiff U.S. Rubber vigorously disputes this,[31] the evidence shows that an arrangement was made between Milnes and Wright acting for U. S. Rubber. Milnes agreed to give up any rights which he might have in the Rug Sealz tape, and U.S. Rubber in return agreed to purchase all of its Rug Sealz from Milnes.[32]

On April 15, 1954, Carson, Pirie, Scott & Co. ("Carson") ordered "3 cartons Rug Sealz Tape."[33] At this time, the Rug Sealz tape being sold to the trade had not as yet been changed. The new Rug Sealz tape, incorporating the ideas of the Wright patent, was not announced to the trade until sometime in July 1954.[34] However, the Carson order was filled by mistake with the new, changed tape.[35] Because Reinhard did not want Carson to return the mistaken tape, he wrote them a letter on April 22, telling them of the new tape.[36] The tape was delivered to Carson on April 28, 1954.[37]

Wright, through U. S. Rubber's attorney, mailed his patent application on

22. Pl. Prop. Find. No. 114, agreed to by defendant; Tr. pp. 1825, 1834–35.

23. Tr. pp. 1827–29.

24. Tr. pp. 1946–47.

25. Def. Ex. 31, pp. 101, 103, 105, Nos. 268, 269, 270, 275, 276; Tr. p. 1956.

26. Tr. p. 191; see Pl. Exs. 28, 29.

27. Tr. pp. 1814–15.

28. Tr. pp. 1854–55, 2787–88.

29. Tr. p. 1855.

30. Tr. p. 1856.

31. Tr. p. 2890.

32. See Milnes' direct testimony at Tr. pp. 1848–53 and Pl. Ex. 114. The parties stipulated that with the pre-Wright Rug Sealz tape, U. S. Rubber was constantly shopping around for cheaper sources of supply and, in fact, bought from more than one supplier, Tr. p. 2076, whereas with the changed tape it has only purchased from Milnes' company and has never sought other bids on the tape. Tr. pp. 2077–78.

33. Pl. Ex. 47 (Carson, Pirie, Scott & Co. Copy of Order).

34. See Pl. Ex. 63; Tr. pp. 252–53.

35. Tr. pp. 242–43.

36. Pl. Ex. 55.

37. Pl. Ex. 50; Tr. pp. 892–93.

Friday, April 22, 1955.[38] The patent application received a filing date of April 25, 1955. Wright assigned his rights to and interest in his invention and patent application to U. S. Rubber on April 22, 1955.[39]

Defendant's Klosette tape—the allegedly infringing tape—originated in a December 1954 meeting of defendant's personnel, held several months after U. S. Rubber began selling the changed Rug Sealz tape but before Wright applied for his patent. One of defendant's officers brought a sample of tape copied from a competitor to the meeting, and the men present decided that defendant should manufacture such a tape.[40] Actual manufacture began in December 1954 or January 1955,[41] and the tape produced was in all material respects identical to the changed Rug Sealz tape.[42] In January 1955, Reinhard became aware of defendant's tape.[43] He told one of defendant's salesmen, Mr. Irving Klyman, and one of defendant's officers, Mr. Eli Freyberg, that their tape infringed his patent.[44] Subsequently, in 1955, defendant changed the weft yarn used in its tape from one 2200 denier zero-twist yarn to four parallel 600 denier yarns of 2.5 twists per inch,[45] and the center row of longitudinal stitching from two yarns, as in plaintiffs' product, to one.[46] These two changed features are the only material differences between defendant's tape and U. S. Rubber's present Rug Sealz tape.[47] The change in the longitudinal stitching admittedly had no significant effect on the structure, function, or quality of the tape.[48] The change in the weft yarn also caused no functional difference in the tape,[49] e. g., in strength and adhesive absorption. Defendant's tape is still the structural equivalent of Rug Sealz, which is an embodiment of the ideas of the Wright patent and the second Reinhard patent. Assuming these patents to be valid, defendant's tape infringes them.

Plaintiffs' tapes were marked, with regard to patent numbers, by a label stapled on to the outer end of each roll of tape.[50] Rug Sealz tape, before it was changed, was marked with the number of the second Reinhard patent shortly after that patent issued.[51] After the Wright patent issued, Rug Sealz tape was also marked with the Wright patent number.[52] About January 12, 1956, U. S. Rubber sent a letter to defendant calling to defendant's attention both the second Reinhard and the Wright patents.[53]

Sales of the changed Rug Sealz tape have grown from approximately 69,000 yards in 1955, to approximately 560,000 yards in 1962, at a price of ten cents per yard. Sales of defendant's Klosette tape have also increased, reaching a total of approximately 412,000 yards in 1961.[54]

## II

Defendant has advanced a number of grounds allegedly barring relief to plaintiffs here. Its basic argument is that claims one and three of the second Reinhard patent and all claims of the Wright patent are invalid because they are not inventive within the requirements of 35 U.S.C. §§ 101, 103. Some of defendant's other contentions are that Wright was not the inventor of the Wright patent, that the description of the process by which the subject matter of that patent is made is insufficient, that plaintiffs have unclean hands for a number of reasons,

38. Tr. pp. 2830–31.

39. Pl. Ex. 74.

40. Tr. pp. 1275–77, 1205–06.

41. Tr. p. 1208.

42. Pl. Ex. 98, columns 1, 2.

43. Tr. pp. 264–65.

44. Tr. pp. 265–67, 1207–08.

45. Tr. pp. 1482–84, 1501.

46. Pl. Ex. 98, columns 2, 3.

47. Tr. pp. 714, 1286; Pl.Prop.Find., No. 237, agreed to by defendant.

48. Tr. pp. 714, 1286.

49. Tr. pp. 735–36, 744–45, 2342–43.

50. Tr. p. 515.

51. Tr. pp. 220–21.

52. Tr. p. 281.

53. Pl. Ex. 112; Tr. pp. 1242–43, 1261–64.

54. Pl.Prop.Find., No. 371, not factually disputed by defendant.

including patent misuse, that the subject matter of each of the patents was "on sale" or "in public use" more than a year prior to the applications therefor, that plaintiffs have not marked their patented products properly and have not given actual notice of infringement, and that plaintiffs have been guilty of laches.

▮ Turning to defendant's principal contention—lack of invention—Sections 101 and 103 of 35 U.S.C. provide:

"§ 101.  Inventions patentable

"Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

"§ 103.  Conditions for patentability; non-obvious subject matter

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

There is a rebuttable presumption in favor of the patents, and the burden of establishing invalidity is on defendant. 35 U.S.C. § 282; Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983 (1937). The proper weight to be given the presumption was stated by the Court of Appeals for this Circuit in Lorenz v. F. W. Woolworth Co., 305 F.2d 102, 105 (2 Cir. 1962):

"Appellant places great weight on the presumption of validity attached by statute to a duly issued patent (35 U.S.C. § 282 (1958)). The presumption of validity relieves the patent holder of the burden of establishing that validity as a requisite for the successful maintenance of an infringement action, and places the burden of establishing invalidity on the alleged infringer who asserts it. International Carrier-Call & Television Corp. v. Radio Corp. of America, 142 F.2d 493, 495 (2d Cir., 1944); Western States Mach. Co. v. S. S. Hepworth Co., 147 F.2d 345, 348 (2d Cir.) cert. denied, 325 U.S. 873, 65 S.Ct. 1414, 89 L.Ed. 1991 (1945). More than that, the most that can be said of the presumption is that it requires that reasonable doubt on the question of validity be resolved in favor of the patent holder. See Mumm v. Decker & Sons, 301 U.S. 168, 171, 57 S.Ct. 675, 81 L.Ed. 983 (1937). The statute does not require that the presumption be accorded the weight of actual evidence or that the use of the presumption should affect a decision of invalidity that would otherwise be reached with confidence. This court has recognized the unavoidable obstacles to an accurate and impartial decision that are inherent in *ex parte* proceedings in the patent office, Guide v. Desperak, 249 F.2d 145, 148 (2d Cir. 1957). We cannot properly allow decisions of that office to alter the preponderance of the evidence on the question of validity. See Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 156, 71 S.Ct. 127, 95 L.Ed. 162 (1950); In re Thomson, 26 App. D.C. 419, 425 (1906); cf. Lyon v. Boh, 1 F.2d 48 (S.D.N.Y.1924) (L. Hand, J.), rev'd, 10 F.2d 30 (2d Cir. 1926)." [55]

In order to accurately comprehend the disputed claims of the second Reinhard patent, it is necessary to examine with some care the claims of the first Reinhard patent, even though the validity of that

55.  See Gross v. JFD Mfg. Co., 314 F.2d 196, 198 (2 Cir. 1963).

504

patent is not in issue here.[56] Claims three and nine of the first Reinhard patent, entitled "Carpet Joining Device and Method," are as follows:

"3. As a new article of manufacture a fabric taping for uniting together sections of carpeting along a common seam portion comprising a narrow strip of fabric material, a plurality of relatively narrow metal strips disposed along the length of the tape transversely thereof, means securing said strips to the back of the tape, grippers protruding from the other side of the tape for engaging the adjoining sections of carpeting and a paper backing of somewhat greater width than the strip of fabric material.

"9. A carpet joining device comprising a fabric tape for uniting together sections of carpeting along a common seam portion and metallic gripper elements protruding from the surface of the tape for engaging the adjoining sections of carpeting and holding the edges thereof in closely abutting relationship, said fabric material being relatively inextensible in a direction transverse of the carpet seam but relatively extensible longitudinally of the seam whereby the carpet sections may be stretched without breaking the seam." [57]

The advantages of the device upon which Reinhard based his claims of patentability in the first Reinhard patent were: (1) the use of metal grippers in the carpet-seaming tape to eliminate the need for tacks to hold the carpet in place

after adhesive was applied to the tape; and (2) stretchability in a lengthwise direction for the carpet-seaming fabric compared to a lack of stretchability thereof in the transverse direction.[58]

Reinhard applied for his second patent covering carpet-seaming tape after his application for the first patent was filed but before the first patent was issued. The only feature of the second Reinhard patent which is new, vis a vis the first Reinhard patent, is what plaintiffs refer to as "coextensibility," i. e., the idea of having the paper underlay, as well as the fabric tape, longitudinally stretchable so that the paper will stretch along with the fabric portion instead of resisting such stretch.[59] Claim three of the second Reinhard patent, entitled "Extensible Tape for Joining Carpet Sections," is as follows:

"3. A tape for adhesively joining together adjacent carpet sections at the abutting edges, comprising an elongated narrow fabric extensible lengthwise to permit stretching of the carpet along the seam, but substantially inextensible widthwise to hold the edges in abutting relationship after they are secured together by the tape, and a backing of crinkled paper secured to the opposite side of the tape to localize adhesive applied to the surface thereof, the wrinkles running transversely of the tape so as to be extensible in a direction lengthwise of the tape with the fabric portion." [60]

Plaintiffs argue that this idea of coextensibility is manifested in the use of crepe paper as an underlay rather than

56. Plaintiffs have made clear that the claims of infringement here do not rest on this patent, and defendant does not attack this patent. Tr. pp. 2847, 2913–14.

57. Pl. Ex. 5.

58. Neither Reinhard's first nor second patent claims as an advantage the idea that the article to be manufactured would consist of a fabric portion and a paper portion already joined together when it came to the user of the tape, rather than, as was common in the industry before, a fabric portion and a paper strip used sep-

arately but not pre-joined together. Tr. pp. 2855–58.

59. Tr. pp. 2849, 2889. Defendant claims that coextensibility is necessarily claimed by the first Reinhard patent and on that ground, therefore, the second Reinhard patent is not inventive. Tr. pp. 2876–78.

60. Pl. Ex. 18. Plaintiffs contend that claims one and three of the second Reinhard patent have been infringed, but concede that claims one and three state the same thing in different words. Tr. pp. 2904–05.

flat paper, which was used in the first Reinhard patent.[61] The alleged advantage of the use of crepe paper as a backing for the fabric is stated in the second Reinhard patent itself as follows:

"[T]he usual paper backing creates a condition of stress so that when the carpet is rolled lengthwise of the seam, wrinkles and irregularities occur which persist after the carpet is again unrolled.

"In accordance with my present invention, I have found that these objections may be fulfilled and wrinkling eliminated by providing a fabric carpet-joining tape, extensible lengthwise and relatively inextensible crosswise of the tape with a backing of crepe or crinkled paper which will provide the desired degree of protection to the floor surface and at the same time will extend with the fabric portion of the tape longitudinally of the seam during stretching operations, but will be relatively inextensible transversely of the seam." [62]

At trial, plaintiffs also made the contention that the use of crepe paper provided the advantage of noiselessness in addition to elimination of resistance to stretch.[63]

■ I find that this "coextensibility" or crepe paper feature is not "useful," and, therefore, that the patent does not meet the minimum standard of patentability set forth in 35 U.S.C. § 101. Ara T. Dildilian, a man of vast experience in the field, testified that use of crepe paper instead of flat paper does not eliminate tension by increased stretch-

ability, because flat paper breaks easily in stretching, and, therefore, does not "create any resistance at all." [64] He believes that crepe paper, therefore, does not create the alleged advantage of preventing wrinkling of the carpet face.[65] Supporting this point, defendant had a carpet layer seam and stretch pieces of carpet in court and measure the distance which each seam stretched. The results showed that the seam made with Bigelow-Sanford flat paper stretched more than the seam made with crepe paper.[66]

Harry C. DeVoe, plaintiffs' witness, seamed carpets himself at the trial, and he testified as to the appearance of the resulting seams. He stated that the distortions which he found in carpets seamed with flat paper were barely discernible [67] or hardly noticeable,[68] and would probably disappear when walked on,[69] or would sufficiently disappear when walked on so that any wrinkles remaining would not be visible to the naked eye.[70] He stated that they would also disappear when the carpet was stretched.[71] DeVoe also indicated that at least some of the distortion which appears on the face of carpets which have been rolled up has nothing to do with the paper underlay, but is analogous to the displacement of fibers which occurs when a fur coat is ruffled, and then straightened out by brushing.[72]

It is true that there was testimony from plaintiffs' witnesses that crepe paper makes the entire tape more easily stretchable and that this increased stretchability overcomes a defect in the prior art, namely that wrinkles and distortions appear in the face of carpets

61. Tr. pp. 2855, 2681; see Pl. Ex. 109. At one point, plaintiffs indicated that a longitudinally stretchable fabric, in addition to a longitudinally stretchable paper, is also claimed in the second Reinhard patent, Tr. p. 2980, but on the whole they admit that such a fabric was claimed in the first Reinhard patent. E. g., Tr. p. 2854.

62. Pl. Ex. 18, column 1, lines 42–55, column 2, lines 1–3.

63. Tr. pp. 550–51, 1628–33.

64. Tr. pp. 977–78.

65. Tr. pp. 1004–06.

66. Tr. pp. 1577–79.

67. Tr. p. 2524.

68. Tr. p. 2514.

69. Tr. pp. 2509–10, 2515.

70. Tr. p. 2525.

71. Tr. p. 2528.

72. Tr. pp. 2528–29.

seamed with flat paper tapes because the flat paper retards the stretchability of the tape as a whole.[73] However, based upon all the evidence and my judgment as to credibility, I find that flat paper does not ordinarily cause wrinkling, and that what wrinkling it does cause can ordinarily be removed merely by being walked on or by the normal "stretching-in" of the rug. Therefore, the alleged defect in flat paper is not significant and that problem of the prior art does not exist.[74] Thus, the crepe paper is not "useful" in the manner claimed.[75]

As to noiselessness, it is true that Reinhard testified that flat paper tape seams are noisy when walked on while crepe paper seams are not,[76] and that people in the trade whom he has visited have asked him if his tapes were noisy.[77] In court, demonstration with carpet sections seamed with different tapes revealed that one flat paper seam made noise when walked on, while one crepe paper tape seam did not.[78] I find that some flat paper seams may make a slight noise when walked on, while there is no evidence that crepe paper tape seams do the same. However, this slight claimed advantage, which was clearly an afterthought advanced apparently for the first time some twelve years after the patent application,[79] is hardly a significant enough advance over the prior art to constitute patentable utility, since the significant aspects of a carpet tape are its strength, ease of application, and effect on appearance.[80]

Under this view of the second Reinhard patent, it is not necessary to consider in detail whether the patent meets the requirements of 35 U.S.C. § 103. An analysis of the standards to be applied in construing that section is contained below, at pages 507, 508 where the validity of the Wright patent is discussed. Were it necessary to the decision here, I would find that the second Reinhard patent is also invalid under Section 103, because the use of crepe paper to achieve stretchability was "obvious" to a person having ordinary skill in the art.[81]

■ Turning now to the Wright patent, the new ideas were the use in a carpet-seaming tape of untwisted weft yarns and the mechanical stitching together, rather than adhering together, of a paper underlay and fabric. All of the six claims in the Wright patent claim one or both of these ideas. The alleged principal advantage of these new features were greater adhesive absorptive capacity, faster adhesive drying, with the consequent elimination of the need for one of the two rows of tacks usually necessary in face-seaming, and a reduction in the cost of manufacturing. It appears that superior adhesive absorption and drying and the advantages flowing from that do exist, and I so find. With regard to the reduction in cost, the advantage claimed in the patent is elimination of the need to pre-treat the fabric portion of the tape with adhesives.[82] There is some doubt that the

73. E. g., Tr. pp. 102–06, 398, 402, 414–16, 623–25.

74. See Titcomb v. Morton Co., 307 F.2d 253, 256 (2 Cir. 1962).

75. Plaintiffs agree that the utility and patentability of the second Reinhard patent is to be determined by comparing it with flat paper together with one of the fabric tapes available prior to the application for that patent. Plaintiffs' Main Brief, p. 16.

76. Tr. pp. 550–51.

77. Tr. p. 2674.

78. Tr. p. 1599.

79. Cf. Tinnerman Prods., Inc. v. George K. Garrett Co., 292 F.2d 137, 140 (3 Cir.), cert. denied, 368 U.S. 833, 82 S.Ct. 58, 7 L.Ed.2d 35 (1961), holding that a feature or advantage not mentioned by the patentee before the Patent Office cannot be the sole basis for patentability in a subsequent litigation.

80. See Deering, Milliken & Co. v. Temp-Resisto Corp., 274 F.2d 626, 633–34 (2 Cir. 1960) and cases cited therein.

81. Cf. Reinhard's own testimony admitting that crepe paper was in use before 1949, and that it was obvious that crepe paper is stretchable. Tr. pp. 463–64, 1733.

82. Pl. Ex. 75, column 1, lines 57–58.

idea which Wright claimed actually did offer such an advantage. However, on the extremely scanty evidence on this point,[83] I cannot find that defendant has met its burden [84] of showing that there was not such an advantage or that such advantage, if it did exist, did not flow from the idea of mechanically attaching the paper and fabric. However, whether the advantages flowing from the Wright patent cause the process described therein to rise to the level of being "new and useful" within the meaning of 35 U.S.C. § 101 is another matter. Assuming, however, for the purpose of discussion that they do, the patent still does not meet the requirement of 35 U.S.C. § 103 that a "new and useful" invention be more than an "obvious" advance over the prior art. See Griffith Rubber Mills v. Hoffar, 313 F.2d 1, 2–3, n. 7 (9 Cir. 1963).

In Wintermute v. Hermetic Seal Corp., 279 F.2d 60, 62 (3 Cir., 1960), the Court said of Section 103 that the statutory standard is whether "Given the particular problem and the need for its solution, a skilled mechanic could draw upon his knowledge of the art to create the [device] here involved, or one substantially like it, without the exercise of inventive faculty." [85] In Schaefer, Inc. v. Mohawk Cabinet Co., 276 F.2d 204, 207 (2 Cir. 1960), Judge Learned Hand stated:

"This scrutiny amounts to nothing more than a common-sense appraisal: where a particular aggregation of recognized elements produces something novel, it is patentable; where it merely embellishes one of the ingredient elements, it is not. We agree that the standard is always

subjective, the creature of an imagination projected upon the future out of materials of the past. The law is full of such standards, without which we should again and again be throttled by an infinity of prescriptions. The best we can do is to set forth in detail the reasons which appear, not only to justify, but to demand, our conclusion."

Here, the prior art (most notably Reinhard's first and second patents) disclosed a carpet tape composed of a strip of woven fabric glued on a piece of crepe paper backing. Wright changed the fabric portion of the tape from a prewoven tape to two lines of continuous, untwisted fabric which were woven back and forth along the width of the crepe paper backing and which were stitched onto that paper by rows of threads running longitudinally on the paper. Both of the allegedly inventive features —the untwisted yarn and the stitching of weft yarns onto a backing—were disclosed by the prior art.

Milnes testified that untwisted yarns were known and in use in 1953; he said that untwisted yarn was a market item which anyone could buy, although very little of it was used.[86] Dildilian testified that untwisted yarns were in common use before 1953.[87] And more important, the Carlson patent [88] disclosed use of untwisted filaments in paper box-seaming tape for good adhesive absorption and great strength with a minimum thickness because of the flattening action of the ribbon [89]—the same reasons for which untwisted yarn was used in the Wright patent. The Wright patent it-

---

83. See Tr. p. 2929, where plaintiffs' counsel indicates that "the only evidence on cost advantage" is a statement made by defendant's counsel that defendant's tape sells for less than any tape in which the fabric portion has to be attached to the paper portion in different operations. Tr. pp. 1317–18; see Tr. pp. 2868–69.

84. See Tr. p. 2920.

85. This language was quoted with approval in Gross v. JFD Mfg. Co., 314 F.2d 196, 200 (2 Cir. 1963).

86. Tr. pp. 1864, 1938.

87. Tr. pp. 1086–88.

88. U. S. Patent No. 2,610,936, issued on September 16, 1952 to A. E. Carlson; Def. Ex. 78.

89. Def. Ex. 78, column 3, lines 30–63.

self recognizes the prior use of untwisted yarns in seaming tapes.[90]

The stitching of the fabric onto a backing was also prior art. Stitching weft threads onto a pre-existing fabric by the precise methed contemplated in the Wright patent was known at least in 1950 when Milnes applied for a patent on this idea.[91] He abandoned this patent application, at least in part, because of the prior art in the field.[92] Milnes had used the Bindex method of knitting to join many different materials and backings, e. g., crinoline backing and wire weft,[93] some of which had been offered for sale in the trade well before the Wright patent had been applied for.[94]

Assuming that a mechanic skilled in fabrics and tape had addressed himself to the problems which Wright supposedly solved, e. g., greater and faster adhesive absorption and cost reduction, I believe that it would have been obvious to substitute crepe paper and fabric for the materials used by Milnes and to untwist the yarn and stitch it directly onto the paper by the Bindex or other method. The Wright patent is merely a combination of the old Rug Sealz tape, the Bindex construction,[95] and untwisted yarn. Rug Sealz was sold on the open market as were Bindex tapes. As to the last ingredient, Milnes, though he was a difficult witness for defendant, testified quite clearly that if he had wanted to increase the adhesive absorption of carpet-seaming tape, he would do so by using untwisted yarn.[96] The advances embodied in the Wright patent do not, therefore, support invention or patentability. They are merely the result of "the usual and common desire of manufacturers constantly to improve their product—the stimulus of nearly all routine engineering improvements * *." E. J. Brooke Co. v. Stoffel Seals Corp., 266 F.2d 841, 842 (2 Cir.), cert. denied, 361 U.S. 883, 80 S.Ct. 154, 4 L.Ed.2d 119 (1959). There has been some discussion as to whether the enactment of Section 103 in 1952 relaxed the standard to be applied in testing the "obviousness" of an alleged invention.[97] The cases in this Circuit cited in support of the argument that the standard has been relaxed are Lyon v. Bausch & Lomb Optical Co.[98] and Reiner v. I. Leon Co.[99] In making my finding, I have assumed that the standard set forth in these cases applies.

### III

■ Under this view of the case, it is unnecessary to consider defendant's other contentions. Some of defendant's other arguments are weighty indeed, particularly its claims that Wright was not the inventor of the Wright patent, that because of the arrangement between Wright and Milnes the Wright patent should not be enforced,[100] and that the

90. Pl. Ex. 75, column 1, lines 33–40:
    "Yarns of low extensibility and high strength are obtained by employing untwisted yarns made of very long or substantially continuous filaments. Heretofore, such yarns containing relatively fine filaments have been used as transverse members in seaming tapes, but in order to secure each of the filaments of the yarn to the paper strip base, the yarns were saturated with an adhesive and then adhered to the paper strip."

91. See Def. Ex. 80.

92. Tr. pp. 2030–31.

93. Pl. Ex. 31, p. 45.

94. Tr. pp. 1808–11.

95. Compare the similarity of Milnes' Bindex Tape No. 234A, Def. Ex. 31, p. 55, with U. S. Rubber's Weld-O-Seam tape,

Def. Ex. 32, which plaintiffs contend is covered by the Wright patent. Tr. p. 2952.

96. Tr. pp. 2017–18, 2023.

97. See generally Note, The Standard of Patentability—Judicial Interpretation of Section 103 of the Patent Act, 63 Col. L.Rev. 306 (1963) ; cf. Rifkind, The Romance Discoverable in Patent Cases, 16 F.R.D. 253, 259 (1954).

98. 224 F.2d 530 (2 Cir.), cert. denied, 350 U.S. 911, 76 S.Ct. 193, 100 L.Ed. 799 (1955).

99. 285 F.2d 501 (2 Cir. 1960), cert. denied, 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961).

100. See Defendant's Post-trial Brief, pp. 42–43, 65.

description of the process by which the subject matter of that patent is made is insufficient.[101]  A word should be said, however, about an evidence point raised by plaintiffs.  Since Wright is deceased, plaintiffs objected on the basis of the New York "Dead Man's Statute"[102] to those portions of Milnes' testimony concerning personal transactions or conversations he had with Wright.  That statute provides that a witness "interested in the event" is incompetent to testify to personal transactions or communications with a decedent in a proceeding against the decedent's estate or a person deriving his interest through the decedent.  The statute does not bar the testimony of Milnes because Wright dealt with Milnes solely in Wright's capacity as an employee of U. S. Rubber.[103] "[T]he rule is clear that Section 347 does not bar evidence of conversations had with an officer or agent of a corporation, even though such officer or agent be dead at the time of trial."[104]  In addition, it would not appear that Milnes is a person "interested in the event" within the meaning of the statute.[105]  Moreover, his interest, if any, would not seem to be adverse to that of U. S. Rubber, since, under the arrangement between Milnes and U. S. Rubber,[106] he benefits from continuing to be its exclusive supplier of Rug Sealz tape, allegedly protected by the Wright patent.  In any event, my finding as to the Wright patent would be the same even if I disregarded Milnes' testimony as to his personal conversations with Wright.

The foregoing constitutes the Court's findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a), 28 U.S.C.  A decree, in accordance with these findings and conclusions holding claims one and three of the Reinhard patent and all the claims of the Wright patent invalid, shall be settled on notice

101.  Cf. Zoomar, Inc. v. Paillard Prods., Inc., 152 F.Supp. 328, 336 n. 11 (S.D. N.Y.1957), aff'd, 258 F.2d 527 (2 Cir.), cert. denied, 358 U.S. 908, 79 S.Ct. 237, 3 L.Ed.2d 230 (1958).

102.  New York C.P.A. § 347 ; Tr. pp. 1760–61.

103.  Tr. p. 1817.

104.  Gabbe v. Kleban Drug Corp., 6 Misc. 2d 457, 161 N.Y.S.2d 245, 248 (Sup.Ct. 1957).

105.  Reynolds v. Snow, 10 A.D.2d 101, 197 N.Y.S.2d 590, 598 (1st Dep't), aff'd per curiam, 8 N.Y.2d 901, 204 N.Y.S.2d 146 (Ct.App.1960).

106.  See text accompanying notes 31–32 supra.