Evelyn COURTLAND, Plaintiff,

v.

WALSTON & CO., INC., et al.,
Defendants.

No. 66 Civ. 1024.

United States District Court,
S. D. New York.

Feb. 10, 1972.

Shearman & Sterling, New York City, for defendants; Lunney, Downey & Crocco, by J. Robert Lunney, New York City, of counsel.

Grossman & Grossman, New York City, for plaintiff; by Harry Grossman, Richard Kaye, New York City, of counsel.

## OPINION

BRIEANT, District Judge.

Plaintiff, a disappointed former customer of an investment house, brings this action against her stockbrokers ("Walston"), and also against the executors of a deceased registered representative formerly employed by Walston, ("decedent"). The action is based upon alleged violations of the Securities Act of 1933, 15 U.S.C. § 77a et seq., the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., and the Investment Advisers Act of 1940, 15 U.S.C. § 80b–1 et seq. The complaint also makes reference to Section 352 of the General Business Law of the State of New York.

Plaintiff is a resident of the City, County and State of New York. The corporate defendant is a Delaware corporation, having its principal office in the City of New York, and is authorized to do business in this State. Decedent was a resident of Greenwich, Connecticut, and his Will was duly admitted to probate there.

This action was tried before me, without a jury, on December 8 and 9, 1971. Decedent was registered as an investment adviser pursuant to § 203 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–3. He was a registered representative of the corporate defendant, and in charge of its investment advisory service. Decedent was highly respected in the securities industry, and had been a registered representative for many years prior to his death at the age of 61 in 1965. He was Senior Vice

President and Director of Technical Research for Walston.

For a number of years he had authored a "Weekly Market Letter." This letter was circulated by mail each Friday to customers and potential customers of Walston.

In 1963–4, Walston was a substantial broker-dealer in securities, having more than 2,000 employees, and offices in several major cities. It was a Member Firm of the New York Stock Exchange and was represented on other national securities exchanges. In 1963, plaintiff had an account in the Waldorf Astoria branch of Walston. In April, 1964, plaintiff, at her request, had her account transferred to the 72 Wall Street branch of Walston in New York City, and, simultaneously, arranged for decedent to become her registered representative.

At that time, Walston had a "Technical Research Department" located at that address. This Department consisted of decedent, his son and four or five registered representatives. All accounts serviced by the Technical Research Department were considered as accounts of the Department.

The first count of the complaint asserts that defendants employed devices and schemes which were calculated to defraud the plaintiff, by distributing bulletins, news items and other writings suggesting and recommending the purchase, retention or disposition of various securities at a time when defendants, their employees and officers, decedent and his associates, had, within a short time prior to recommending the purchase of certain securities, effected purchases of the same securities for themselves, and thereafter "intended to and in fact did effect the sale of said securities after the distribution of said recommendations."

It was asserted that plaintiff purchased certain securities relying on such recommendations, without knowledge of the fact that defendants had purchased securities prior thereto at a lower price and intended to sell such securities at the same time, but these allegations, contained in paragraph 11 were subsequently retracted by plaintiff prior to trial.

The first count, as in part retracted, states that defendants induced plaintiff to sell her previously acquired securities at a loss and that the practices employed by defendants operated as a fraud and deceit, and plaintiff was damaged in the amount of $75,000.00.

The second count in the complaint repeats the allegations in the first count and states that plaintiff employed defendants for the purpose of recommending securities purchases and sales and for the purpose of effecting such purchases and sales, that they owed plaintiff a high degree of fiduciary duty in performing services for her and in so representing her.

Paragraph 18 of the second count has also been retracted. This paragraph alleged that the defendants breached their fiduciary duty to her by purchasing for her account securities which had previously been purchased by defendants while intending at the same time to sell their own securities.

The third count in the complaint alleges that plaintiff had instructed defendants to purchase for her 100 shares of General Motors Common Stock and 100 shares of Common Stock of Xerox Corporation and that defendants failed and refused to purchase these securities, and had they done so, plaintiff would have enjoyed a profit of $15,000.-00. The third count was dismissed at the close of the plaintiff's case and with respect thereto I find that plaintiff did instruct the defendants to purchase for her account the two securities mentioned, and that defendants then and there at the same time orally refused to do so. Immediately on giving the instructions, plaintiff knew that her agents and fiduciaries were not going to make these purchases, and in refusing to make the purchases for her account they acted within their rights. Plaintiff can claim no damages as a result of the failure to buy these

securities since at the very least she had the immediate duty to purchase them elsewhere so as to minimize her damages. A stockbroker need not accept the orders of a customer so long as he makes clear at the time the orders are given that he refuses to perform them. See Busch v. L. F. Rothschild & Co., 23 A.D.2d 189, 259 N.Y.S.2d 239 (1965) and cases cited therein.

Plaintiff, a single woman whose age was approximately 38 at the time of the incidents complained of, is a professional artist. She graduated from Radcliffe College, *magna cum laude*, and was elected to Phi Beta Kappa. She had considerable experience in the securities market. For a number of years she had a joint account in another house with her mother, and later with her sister. She inherited stocks from her mother. At the time that she opened her account with Walston she was also trading at E. F. Hutton & Company. While her pattern of trading was ordinarily what would be described as that of a long term investor, rather than that of an in-and-out trader, or speculator, plaintiff had the education, experience and ability to trade in a knowledgeable manner in the securities market. She held stocks on margin, and was, as suggested by defendants' counsel on the trial, "no babe-in-the-woods."

In April, 1964, when, at her request, her account at Walston had been transferred to the Technical Research Department, to be operated under the general direction and advice of decedent, a representative of Walston told plaintiff that decedent would not accept transfer of her account at Walston's Waldorf Astoria branch, unless she would also transfer her account at E. F. Hutton & Co. As decedent dealt only with large accounts, plaintiff was advised, all accounts would have to be transferred to him. Plaintiff accordingly signed transfer cards, and had her Waldorf branch account and her E. F. Hutton account transferred to decedent's Department at 72 Wall Street. At that time the debit balance in her margin account was approximately $90,-000.00, and the market value of the securities was slightly more than twice that, or $180,000.00.

At the time of the transfer, plaintiff told decedent that she was an artist, and had little time or interest to handle her affairs, and that she desired to travel in Europe and elsewhere and wanted to have her account managed in her absence. Acting on this information, defendant furnished the usual printed form of power of attorney to allow decedent to administer her account at Walston as a "discretionary account", and to give orders for purchases and sales in her absence, and without her express directions. Plaintiff failed to sign this card, although asked to do so on more than one occasion, and the account never became a discretionary account. Notwithstanding this fact, I find that plaintiff did seek investment advice from decedent, and those registered representatives working under his direct control, that a fiduciary relationship existed, and the relationship of investment adviser and customer as contemplated by the Investment Advisers Act of 1940 arose. Such relationship need not depend upon the execution of a formal power of attorney to arise under all of the circumstances of this case. When a registered representative is giving more than the normal amount of incidental investment advice, and has instilled in the customer such a degree of confidence in himself and reliance upon his advice that the customer clearly feels, and the registered representative knows that the customer feels, that the registered representative is acting in the customer's interest, a fiduciary relationship may arise, notwithstanding the fact that the "blue card" giving defendants power of attorney to trade the account was never signed and filed. Haley & Co., 37 S.E.C. 100, 106 (1956).

Decedent reviewed a list of plaintiff's stocks showing historical costs and made circles indicating his recommendation to sell a number of these stocks. The stated purposes of these recommendations were to obtain the recognition of tax losses

which already existed with respect to all but one of these securities, to save interest on the margin account, and also to generate buying power. Plaintiff took issue with this recommendation, and reminded decedent that it was Spring, and generally one took tax losses in December, and asked how she could know what profits she would realize during the balance of the calendar year.

Decedent, in support of his recommendation, told plaintiff that stocks would be recommended to her in advance of the weekly market letter, and that those were the stocks she was to buy, but that in her margin account she did not have cash to buy. Decedent told her, and she states that she already knew, that he had a market letter and that she would be advised in advance of what was coming out in this letter, and that she must buy those recommended stocks and those stocks only, or he would not be bothered with her account.

Plaintiff, a reasonably sophisticated investor and an educated person, was looking at this time for an "edge". She entered into the relationship with defendants intending to benefit by this practice of recommending stocks to customers prior to their appearance in the influential and highly regarded weekly market letter. Her expectations were reinforced by Walston's employee, the witness Crane, who told her in substance that decedent was a great genius, the genius of Wall Street, and that she must do as he said or that he would not be bothered with the account.

Later, plaintiff, accompanied by the witness Adamson, visited decedent and Crane during the middle of April, having made a prior telephone appointment, and on this occasion, decedent told her that if she wanted to have him as her adviser, she would have to do as he said, which was to buy the stocks recommended in his market letter, and that she would be told in advance of the market letter so that therefore she would get them cheaper. At that time decedent reiterated his advice to sell certain securities and added one more sale recommendation.

On the occasion of that visit, Crane again advised her that decedent was a great genius, and that she must do as he said or he would not be bothered with her.

Thereafter, plaintiff made sales through Walston totaling $29,806.27. (Details omitted)

Plaintiff reiterated that the purpose of making these sales and the basic reason given her by decedent was "to raise buying power so I could buy the stocks he recommended". Subsequently, plaintiff bought certain shares through Walston on the recommendation of decedent. She purchased 100 shares of American Can on June 5, 1964 at $44½ and 100 shares of Ilikon on June 11, 1964 at $27⅝. Except for Ilikon, which is quoted in the over-the-counter market, all of the securities sold or purchased through defendants by plaintiff are listed on the New York Stock Exchange. Instrumentalities of interstate commerce were utilized, in that plaintiff on more than one occasion made appointments with decedent by telephone.

On June 19, 1964, the weekly market letter recommended the purchase of Copperweld Steel. The July 10, 1964 market letter recommended the purchase of Clevite Corporation. Crane told plaintiff that she had to buy these stocks, particularly Clevite, but she did not do so. The conversations with respect to Clevite and Copperweld took place before the market letter was actually received.

There is no proof that decedent or Walston or any persons acting for them or in their behalf, purchased any of the stocks mentioned in the market letter, or sold any of them during the relevant period. The market letter, copies of which were offered in evidence, contains the specific disclaimer "Walston & Co., Inc. and Officers, Directors, Stockholders and Employees thereof, purchase, sell and may have an interest in securities mentioned herein."

Defendants had the right to tell plaintiff that they would not act as her investment adviser or represent her in any way if she did not follow their advice. Such a statement does not constitute

"duress" and I find no duress practiced on plaintiff on the record before me. Nor were any so-called "boiler room tactics" or "pressure" imposed upon her, as claimed.

Plaintiff's complaint is somewhat fanciful, and in no way supported by evidence, insofar as concerns the charges made that defendants purchased stocks for their own account or sold them for their own account in order to dovetail their activities with the effect on price, if any, of the market letter, or that they conducted a "pool".

■ Nevertheless, plaintiff is entitled to have her pleading deemed amended to conform to the proof and, if based on the proof, any liability under the Securities laws may be found, she is then entitled to her compensatory damages. Federal Rules of Civil Procedure, Rule 15(b).

■ I find that defendants were making recommendations to customers of stocks prior to the appearance thereof in the weekly market letter, and were offering to give plaintiff, and presumably others, the benefit of advance notice of what would appear in the market letter. This, without more, is a fraudulent and deceptive device in connection with the sale of securities. It had as its purpose, effective in the case of plaintiff, to induce the sale of securities which she owned, through defendants, and the purchase of securities recommended by defendants. This, of course, generated a trading volume, and produced brokers' commissions beneficial both to the registered representatives advising plaintiff and to Walston. Use of this device, without more, gives rise to liability, although it is satisfactorily established that the securities recommended were considered "good" recommendations, and that the sales recommendations made are justified, at least in part, by an opportunity to realize for tax purposes already existing paper losses, and to cut down on the risk and interest cost incident upon a margin account.

■ A fortiori, to gain customers and do business upon the suggestion, directly or indirectly, that "tips" of stocks which would be written up in the market letter at a subsequent date would be made available ahead of time to a customer, is also a fraudulent and deceptive practice, even if the suggestion were not followed in actual practice.

Admittedly, plaintiff is an interested witness, and the individual defendant is now deceased. The witness Crane denied on the trial that he was ever told in advance to recommend the purchase of particular stocks which would subsequently become recommendations of the market letter. This denial was categorical.

However, it appeared that in giving his deposition, prior to trial, the witness admitted that "on maybe one or two occasions" decedent had advised Crane that he was going to write up a stock, when he recommended it for purchase by customers. More damning is the testimony of decedent's son and executor. At the times complained of, he, too, was a registered representative, working closely with his father for Walston. He did not testify at the trial. At his deposition, he testified "On occasion of advising—he would in many cases at meetings among members of our staff, mention what stock he intended to write up in the letter." Decedent's son further testified that on occasion decedent would advise others in the Department prior to writing up the market letter, as to which company would be written up at a particular period or date and that usually less than a week prior to the appearance of the letter he would advise the various members of the Department as to which company was going to be involved in the write up and that decedent occasionally recommended the purchase of a stock to a customer prior to writing it up in the market letter.

No explanation was offered on the trial why plaintiff's account was transferred from the Waldorf Astoria branch of Walston to a different registered representative, the author of the market letter, at a different, downtown branch of Walston, other than the testimony of

plaintiff herself. That office was further away. There was no need to make this change merely to get the benefit of the market letter when it hit the street, because the letter was then available without charge to customers of Walston and potential customers. Plaintiff testifies, and her testimony in this regard is uncontradicted, that she transferred her two accounts, and went downtown to get the advantage of decedent's special knowledge, and to enjoy in advance of publication, his recommendations which he would be pushing in the market letter.

A provision of the Investment Advisers Act of 1940, found in 15 U.S.C. § 80b-6 and entitled "Prohibited transactions by investment advisers" provides in part as follows:

> "It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
>
> (1) to employ any device, scheme, or artifice to defraud any client or prospective client;
>
> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> (4) to engage in any act, practice, or course of business which is fradulent, deceptive, or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative."

To the same effect is 15 U.S.C. § 78j, otherwise referred to as Section 10 of the Securities Exchange Act of 1934, which provides in part as follows:

> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Pursuant to its rule-making powers, the Securities and Exchange Commission has promulgated Section 240.10b-5 which, together with the foregoing statutory authority, is now, in view of the recent decision of the Supreme Court of the United States in New York State Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), considered to support private litigation for practically any sin of omission or commission which may be imagined in connection with the purchase or sale of a security. Drachman v. Harvey, 453 F.2d 722, (2d Cir. 1972).

The Commission has not exhausted its rule-making power to the extent of defining exclusively and completely all conceivable conduct which would constitute a "manipulative or deceptive device, act, practice or contrivance" or "fraud or deceit". To do so would fill volumes, and after such defining was done, the inheritors of common law lawyers would find a way to distinguish and elude such definitions.

The Commission at least thinks that it is possible to maintain a manipulative or deceptive device or contrivance in connection with a market letter. The annual report of the Securities and Exchange Commission for its 1947 fiscal year, indicates that the Commission once sought an injunction to restrain alleged frauds on the part of an investment adviser by means of a market letter. We are informed by the Commission's annual

report for that year (15 S.E.C.Ann.Rep. 161) that:

"The complaint (of the Commission) alleged that the defendant had three classes of clients: those who subscribed to his weekly investment advisory letter, those who for an additional fee obtained more personalized advice, and those for whom he managed discretionary accounts. It was alleged that the defendant would first purchase some inactive security for his discretionary accounts, at the same time orally recommending its purchase to the clients receiving the personalized advice, and then several days later would recommend its purchase to the subscribers of the weekly letter. Since the security was inactive, the market would be raised by the subscribers' purchases and the defendant would then sell the security in his discretionary accounts, meanwhile continuing to recommend its purchase in the weekly letter. The Commission alleged that this constituted a practice or course of business which operated as a fraud or deceit upon its clients within the meaning of Sec. 206(2)." (Matter in parenthesis added)

No reported decision is found determining that litigation brought by the Commission in 1946 (S.E.C. v. Todd, U.S.D.Mass. 6149 Civ.1946, not otherwise reported), but the matter is referred to in 3, Loss, Securities Regulations, 2nd Ed. p. 1516. That distinguished author there agrees that a manipulative or deceptive device or contrivance was adequately alleged in the foregoing complaint of the Commission.

Decedent in this case did not claim any special knowledge with respect to the internal operations of any corporation whose stocks were recommended. The nature of his study was rather that of a market analyst, who discerned trends with respect to the public favor or disfavor of securities in particular industries and of particular companies, and also the supply and demand of securities.

Market price of a stock is affected by the management, success and progress of the enterprise, and of the industry in which the issuer is engaged; also by current market trends, cost of money and the forces of supply and demand applied to the particular stock. These latter recognized economic factors unrelated to the issuer or its industry, tend to make a respected market letter, in a sense, a self-fulfilling prophet.

The Supreme Court has commented on the practice of issuing market letters, and their effect on the market, in Securities and Exchange Commission v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). In that case, the Commission sought to enjoin the corporate proprietor of a market letter whose principals purchased shares for their own account shortly before recommending an issue for long-term investment in their market letter. The record showed that on short swings the proprietors of the market letter had been able to produce substantial and immediate increases in the selling prices of shares of six substantial corporations (See 375 U.S. at p. 202, 84 S.Ct. 275) and were able to depress the price of another issue (Chock Full O'Nuts, Inc.) by disparaging its stock in their market letter.

Plaintiff effected the sales of securities acting in reliance on defendant's advice, in order to generate "buying power" so that she could participate in the deceptive and unlawful scheme or plan or gaining benefits from the market letter. She was knowledgeable and experienced. She knew, or must be deemed to have known, that if she received recommendations prior to the publication of the market letter, and bought the stocks recommended, she would be taking advantage of sellers who would be selling the stocks without benefit of such special knowledge and who, if the market letter pushed up the stock, would be financial losers to that extent.

As is so often the case with a manipulative or deceptive device or contrivance

related to the sale of securities, the participation of the buyer, or "tippee" is not induced by gullibility, or reliance upon honesty of the seller, but rather, by a shared larcenous intent.

█ Defendants make much of the intelligence, education and expertise in the securities market of the plaintiff, but this is of no moment. The common law requirements associated with a claim of fraud, are not applicable to violations of the securities laws. Accordingly, a customer having thought to take advantage of such a scheme, intentionally, if her investments do not mature to her satisfaction, may sue the dealer and, relieved from any duty to prove scienter or reliance, will enjoy a windfall. The landmark case of Pearlstein v. Scudder & German, 429 F.2d 1136 (2d Cir.), cert. den. 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed. 550 (1971), granted a securities purchaser a right of action against the broker for a violation of Regulation T, adopted under 15 U.S.C. § 78g(a). It appeared that plaintiff in *Pearlstein* was a lawyer, with extensive experience as a knowledgeable investor, and very likely *in pari delicto*. However, the Court of Appeals in this Circuit held:

> "In our view, the danger of permitting a windfall to an unscrupulous investor is outweighed by the salutary policing effect which the threat of private suits for compensatory damages can have upon brokers and dealers above and beyond the threats of Governmental action by the Securities and Exchange Commission." Id. at 1141

See also Serzysko v. Chase Manhattan Bank, D.C., 290 F.Supp. 74, aff'd 409 F. 2d 1360, (2d Cir.), cert. den. 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180.

Plaintiff has proved facts entitling her to compensatory damages from defendants.

## II

### The "Dead Man's Statute"

Plaintiff's case depends upon her own testimony as to conversations or transactions which she had with the deceased individual registered representative. Both defendants made timely objection pursuant to Section 4519 C.P.L.R., commonly called the "dead man's statute", and her testimony was taken subject to defendant's motion to strike, with respect to which decision was reserved.

Sec. 4519 of the C.P.L.R. of the State of New York as presently in effect, reads, in relevant part, as follows:

> "Upon the trial of an action . . . ., a party . . . interested in the event . . . shall not be examined as a witness in his own behalf, or interest . . . against the executor, administrator or survivor of a deceased person . . ., or a person deriving his title or interest, from, through or under a deceased person . . . by assignment or otherwise, concerning a personal transaction or communication between the witness and the deceased person. . . ."

█ As to the corporate defendant, this rule of evidence raises no problem. It has consistently been held in the Courts of New York, that a party is competent to testify in an action in behalf of or against a principal, with respect to transactions or conversations with the principal's deceased agent. This is because in the literal reading of the statute, a principal is not deemed to take his interest in the subject matter of the litigation "from, through or under" his agent. The agent, who is not interested in the event, may testify as to a transaction he conducted for the principal with the decedent in an action by the principal against the decedent's estate, Matter of Rizzo, 15 A.D.2d 550, 222 N.Y.S.2d 991 (1961), and, similarly, a claimant may testify against the interests of a principal, when the agent is deceased at the time of the suit, with respect to transactions or conversations he had with the agent, Rodenhouse v. American Cas. Co. of Pennsylvania, 20 A.D.2d 620 (4th Dept. 1963), 244 N.Y.S. 2d 856. Here again the proffered testimony cannot affect any right or property derived "from, through or under" the

deceased agent, as the principal of the agent was neither a survivor nor a person deriving his title or interest from, through or under the decedent within the meaning of the statute, Carmen v. Shore Cleaners and Dyers, Inc., 270 App. Div. 945, 62 N.Y.S.2d 362; Melkon v. H. G. Kirk Co., 220 App.Div. 180, 220 N.Y.S. 551; Gabbe v. Kleban Drug Corp., 6 Misc.2d 457, 161 N.Y.S.2d 245; United States Rubber Co. v. Consolidated Trimming Corp., 218 F.Supp. 498, 509 (S.D. N.Y.1963); Leighton v. New York Susquehanna & W. Railroad Co., 303 F. Supp. 599 (S.D.N.Y.1969); Bopple v. Supreme Tent of Knights of Maccabees, 18 App.Div. 488, 45 N.Y.S. 1096 (4th Dept. 1897); Nearpass v. Gilman, 104 N.Y. 506, 10 N.E. 894 (1887).

■ The corporate defendant in this case could not act in any way except through its agent, and as between the two, the principal may be able to exact contribution or indemnification from its deceased agent, but this is beside the point. The New York courts hold that a witness is interested in the event only if he stands to gain or lose by the *direct* and *immediate* operation of the judgment. See Wallace v. Straus, 113 N.Y. 238, 21 N.E. 66; Eisenlord v. Clum, 126 N.Y 552, 27 N.E. 1024; Herrmann v. Jorgenson, 263 N.Y. 348, 189 N.E. 449; Laka v. Krystek, 261 N.Y. 126, 184 N.E. 732. Insofar as concerns the corporate defendant, the objection pursuant to Sec. 4519 C.P.L.R. would not be available to the corporate defendant in the courts of the State of New York and therefore must be unavailable here.

A more serious question arises with respect to admissibility of conversations between Miss Courtland and decedent, when offered against the interest of the defendant executors. There is no "hearsay" objection to the testimony, because the testimony was taken to show extrajudicial admissions by decedent and admissions of a party or his predecessor in interest under these circumstances may be received, as a well recognized exception to the hearsay rule.

Were this action tried in New York State courts, it is clear that such testimony, objected to, would not be admissible as against the executor defendants. The question for decision is whether it is inadmissible in this forum.

In 1938, when the Federal Rules of Civil Procedure were adopted, implicit in their enactment was a required adherence to a national code of procedure, repealing the four principal federal statutes in the evidence field then in effect.[1]

Since 1938, the rules of evidence in federal civil cases have been governed by Rule 43(a) which, in relevant part, reads as follows:

"* * * All evidence shall be admitted which is admissible under the statutes of the United States, *or* under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, or under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held. *In any case, the statute or rule which favors the reception of the evidence governs* and the evidence shall

---

1. These were (1) the Conformity Act, (Revised Statutes § 914 (1875), repealed by Act of June 25, 1948 ch. 646 § 39, 62 Stat. 992, in view of the promulgation of the Federal Rules of Civil Procedure; (2) the Rules of Decision Act (Rev.Stat. § 721 (1875), 28 U.S.C. § 725 (1940). This Act was repealed by 62 Stat. 992 (1948) and re-enacted with slight changes in 28 U.S.C. § 1652 (1958). It now provides that the laws of the several states except where otherwise required by the Constitution or statutes of the United

States shall be regarded as rules of decision in civil actions in federal courts; (3) the Competency of Witnesses Act (Rev.Stat. § 858 (1875), as amended 28 U.S.C. § 631 (1940), which was repealed by 28 U.S.C.Rev. (1948); (4) the Mode of Proof Act (Rev.Stat. § 862 (1875), 28 U.S.C. § 637 (1940), which was superseded by 28 U.S.C. § 2072 et seq. (1952). The statutes overlapped and were interpreted independently of each other, resulting in a host of conflicting decisions. 31 Tulane L.Rev. 101.

be presented according to the most convenient method prescribed in any of the statutes or rules to which reference is herein made. *The competency of a witness to testify shall be determined in like manner."* (Emphasis Added)

Literally interpreted, Rule 43(a) is a rule of admissibility and not one of exclusion. The Rule allows evidence to be admitted providing any one of the three named sources would admit the evidence, regardless of the fact that the other two sources would bar the evidence. The Rule looks to the application of (1) federal statutes; (2) federal equity practice; and (3) state statutes, rules or common law.

There is no express distinction in the rules between diversity of citizenship cases and cases arising under federal law. For example, in Hambrice v. F. W. Woolworth Co., 290 F.2d 557 (5th Cir. 1961), plaintiff slipped on candy on the floor of a retail store. Notwithstanding a state rule of evidence which would have prevented such testimony, a store employee was allowed to testify as to his daily habit of sweeping the floor as some evidence that he had swept the floor at the time of the accident. Similarly, in United States v. Featherston, 325 F.2d 539 (10th Cir. 1963), an expert's opinion of land value, based on comparable sales, was admitted, although inadmissible under Kansas law. See also Harrington v. Texaco, Inc., 339 F.2d 814 (5th Cir. 1964). In a diversity action, Hope v. Hearst Consol. Publications, 294 F.2d 681 (2nd Cir. 1961), cert. den. 368 U.S. 956, 82 S.Ct. 399, 7 L.Ed. 2d 388 (1962), opinion evidence as to the identity of the person libelled was admitted, although inadmissible under New York case law.

Statutory privilege which prevents taking the testimony of a witness is analogous to statutory provisions making testimony incompetent, because upon each may depend the substantive result of litigation, and a case may fail of proof simply because certain evidence, although existing, may not be adduced. In the diversity cases involving statutory privilege, a majority of federal courts have followed the privilege rule of the state in which they sit. The differences in the holdings are, for the most part, based upon differences in opinion as to whether such privilege provisions are to be regarded as procedural or substantive. In this district, we follow the law of New York as to privilege. Munzer v. Swedish American Line, 35 F.Supp. 493, (D.C. 1940); Stiles v. Clifton Springs Sanitarium Co., 74 F.Supp. 907 (D.C. 1947); Rediker v. Warfield, 11 F.R.D. 125 (D.C.); Car & General Ins. Corp. v. Goldstein, 179 F.Supp. 888 (D.C.), aff'd, 277 F.2d 162 (2nd Cir. 1959); Padovani v. Liggett & Myers Tobacco Co., 23 F.R.D. 255 (D.C. 1959); Merlin v. Aetna Life Ins. Co., 180 F.Supp. 90 (D.C. 1960).

The minority view bases contrary decisions on the grounds that a rule of privilege is not substantive, and that even in diversity cases federal courts are free to disregard state practice, even though the result of the litigation may, as a practical matter, be distorted.

█ This Court supports the view that a federal court in a diversity litigation must follow the law of New York and enforce a confidential communication privilege. Engl v. Aetna Life Ins. Co., 139 F.2d 469 (2nd Cir. 1943). Holding that in a diversity action the state rule as to the patient-physician privilege should govern, this Circuit in Massachusetts Mutual Life Ins. Co. v. Brei, 311 F.2d 463 (1962) based its decision squarely on the ground that privilege is more than a rule of procedure, since it goes to relationships established and maintained outside the area of litigation, and affects persons' conduct at the stage of primary private activity, and accordingly a statute or rule establishing a privilege should be classed as substantive rather than procedural.

In Car & General Insurance Corp v. Goldstein, *supra,* the New York attorney-client privilege was held applicable in the federal courts of this Circuit. In Merlin

v. Aetna Life Ins. Co., *supra*, the court held the spousal privilege to apply in federal court.

In federal question cases, however, many courts hold the view that state law relating to privilege is not controlling, and that a federal court is free to decide the question of privilege under whichever evidentiary standard will admit the evidence. Fraser v. United States, 145 F. 2d 139 (6th Cir.), cert. den. 324 U.S. 849, 65 S.Ct. 684, 89 L.Ed. 1409; United States v. Brunner, 200 F.2d 276 (6th Cir.).

A detailed consideration of application of the "Dead Man's Statute" in *diversity* cases is probably of only slight value. Even in such cases, treatment of the rule by Federal courts has been far from uniform.

The principles of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), have not been held to extend to state exclusionary rules of evidence in diversity cases. *Erie* did not deal with procedure or concern procedural matters as to which Rule 43(a) applies. Consequently, in many instances, it becomes of importance to determine whether competency of a witness is considered to involve substantive or procedural law. If substantive, the Federal courts under the *Erie* rule, in diversity litigation, would be required to apply state law, while if it is held a procedural matter, Federal courts must follow Rule 43(a) and admit evidence admissible under any of the admission tests expressly set forth in the statute. The distinction is not made without difficulty. Different Federal courts have reached different conclusions. Not all the decisions, however, are based on a finding of either the procedural or substantive nature of the state rule. Some of the decisions simply refer to Rule 43(a) of the FRCP, while others fail to state a basis upon which they reached the result.

In Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), a case which arose in this Circuit, the question was presented whether a Federal court, in a diversity action for breach of trust and an accounting, was free to disregard an otherwise applicable statute of limitations because defendant's inequitable conduct had prevented plaintiff from learning, within the limitation period, of the wrong done her. The Supreme Court, through Justice Frankfurter, held that (at 108–109, 65 S.Ct. 1469) a Federal court sitting in diversity neither "cannot afford recovery if the right to recover is made unavailable by the State nor can it substantially affect the enforcement of the right as given by the State." The test, said the Court, was as follows:

> "Does it significantly affect the result of a litigation for a federal court to disregard a law of a state that would be controlling in an action upon the same claim by the same parties in a State court? . . . . The outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would if tried in a State court."

In Ragan v. Merchants Transfer & Warehouse Co., 337 U.S. 530, 69 S.Ct. 1233, 93 L.Ed. 1520 (1949) it was held that not only state limitation periods but also steps necessary to toll them were matters of state law, and were binding on Federal courts in diversity cases. Justice Douglas, speaking for the Supreme Court, in barring the action and holding that state law must be looked to in order to find whether an action was commenced for tolling purposes, stated: "It is conceded that if the present case were in a Kansas court it would be barred." But subsequent cases have not evinced the same relish for the application of procedural niceties of state law when independent considerations of federal policy called for a different result. See 2 J. Moore, Federal Practice 772 (2nd Ed. supp. 1970). See also Szantay v. Beech Aircraft Corp., 349 F. 2d 60 (4th Cir. 1965).

The Supreme Court has not directly passed upon the question as to the applicability of *Erie* to state exclusionary

rules of evidence. There are several Supreme Court decisions, however, which hold that the outcome-determinative test must be applied to determine whether a given rule of state law is to be classified as substantive for the purpose of *Erie*. See *Guaranty Trust, supra*; Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). Even if most of the rules of evidence are considered "procedural", the outcome-determinative test may be applicable where particular evidence is admissible under the first or second source of Rule 43(a), but is inadmissible under the respective state rule. See Degnan, The Feasibility of Rules of Evidence in Federal Courts, 24 F.R.D. 341, 351; Note, Federal Rule 43(a): The Scope of Admissibility of Evidence and the Implications of the Erie Doctrine, 62 Col.L.Rev. 1049 (1962); Note, The Admissibility of Evidence Under Federal Rule 43(a), 48 Va.L.Rev. 939, 948 (1962).

Monarch Insurance Co. v. Spach, 281 F.2d 401 (5th Cir.) is a case which squarely faces the problem of the applicability of the outcome-determinative test to state rules of exclusion. The 5th Circuit Court of Appeals indicated that the test is not applicable to most rules of evidence, and held that a Florida statute excluding certain written statements was not within the outcome-determinative principle, since "impeachment evidence can rarely be classified as so decisive in nature that it would in all reasonable probability have a significant effect on the outcome." See also New York Life Insurance Co. v. Harrington, 299 F.2d 803, 806 (9th Cir. 1962).

Byrd v. Blue Ridge Cooperative, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958) and Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), although they did not specifically deal with evidentiary questions, suggest that the outcome-determinative test may have no applicability to state rules of evidence in a diversity case. *Byrd* held that when a countervailing federal policy is present, a state rule of procedure or practice is not binding even if it can be shown that to ignore the state rule may change the outcome of the litigation. In *Hanna* the Court said:

> "*Erie* and its offspring cast no doubt on the long-recognized power of Congress to prescribe housekeeping rules for federal courts even though some of those rules will inevitably differ from comparable state rules. . . . To hold that a federal rule of Civil Procedure must cease to function whenever it alters the mode of enforcing state-created rights would be to disembowel either the Constitution's grant of power over federal procedure or Congress' attempt to exercise that power in the Enabling Act."

While indeed the Dead Man's Statute may be classified as "substantive" since it will, in cases, change the outcome, there yet exists sound reasoning and ample authority for not applying the rule even in a diversity case.

The instant cause of action arises under Federal law, and it is a Federal policy which is being enforced. Congress must have intended with respect to Federal rights existing under these Federal statutes, and not previously cognizable at law or in equity that there be uniform remedies to investors throughout the United States. There are a number of states, a small minority, which do not have statutory provisions equivalent to Sec. 4519 C.P.L.R., and there is great technical divergence among the states which do.[2] Are the

---

2. The states with no Dead Man's Statute include Alaska, New Hampshire, New Mexico, Oregon, Rhode Island and Virginia. Professor Wigmore in a footnote to Section 578 of his treatise on Evidence declines to summarize the interpreting decisions of the statutes of each state having the rule, since: "first, they depend largely on the wording of the local statute; secondly; they are extremely numerous, and usually cannot be correctly summarized without a voluminous statement of the circumstances of the case and a comparison with the various parts of the statute, for which the present space does not suffice. . . . " He adds that

substantive rights of a litigant under a Federal statute to be less or different because he sues in a Federal District Court located in a state which has a "Dead Man's Statute," contrasted with the rights of a plaintiff who may sue in a Federal District Court in a different state where no such rule exists? So to state the question suggests that the evidence should be admitted, under the clear meaning of Rule 43(a). Even if Rule 43(a) does not serve to admit evidence, it seems that where no authority can be found to admit the evidence under the three specific categories of Rule 43(a), such evidence may be admissible under the more general principles of relevancy, materiality and the test of probative force. Dallas County v. Commercial Union Assurance Co., 286 F.2d 388 (5th Cir. 1961), involved litigation resulting because the County courthouse tower collapsed. Plaintiff claimed that lightning caused the destruction. Defendant fire insurance company was permitted to introduce a 58 year old newspaper clipping reporting a fire in the tower, in order to rebut the County's contention that the fire was recent and caused by lightning. The Court of Appeals held that despite the fact that Rule 43(a) enumerates only three categories of admissible evidence, it does not prohibit the receipt of probative evidence outside of the three enumerated categories. The Court deemed the evidence trustworthy and relevant, admitted it, even though hearsay and even though no actual authority existed under the three specific categories. In Hambrice v. F. W. Woolworth Co., supra, the Court stated that the Federal Rules of Civil Procedure indicate a general policy to disregard technicalities and form, and to determine rights of litigants on the merits, and

to that end the rules are to be liberally construed.

In Price v. United States, 335 F.2d 671 (5th Cir. 1964) the government sued the estate of a decedent to recover income tax, penalties, and interest. The decedent's representative objected to the testimony of a government witness on the grounds that the testimony was barred by the Alabama Dead Man's Statute. The Court of Appeals approved admitting the testimony, pursuant to Rule 43(a). The Court observed that as Rule 43(a) does not enumerate the *exclusive* standards of admissibility, "relevant evidence may be admitted which, in the judgment of the trial court, is trustworthy." In Colton v. United States, 306 F.2d 633 (2nd Cir. 1962), the court held that the New York State attorney-client privilege does not apply in federal income tax cases.

In Jerry Vogel Music Co. v. Forster Music Publisher Inc., 147 F.2d 614 (2nd Cir. 1945), cert. den. 325 U.S. 880, 65 S.Ct. 1573, 89 L.Ed. 1996, an action was brought for a declaratory judgment to determine whether plaintiff was the exclusive owner of the traditional ballad written in 1910, "Down By the Old Mill Stream." The Circuit Court applied the New York dead man's statute without discussion of the admissability of the evidence under Rule 43(a). While copyright litigation would ordinarily seem to involve a federal right, which should be treated similarly throughout the country, in order that the result of any case would be the same wherever tried, the dispositive issue was whether a common law property right existed, in the possession of an alleged co-author (the proposed witness) one Smith. The defense sought to be set up by the testi-

---

"This conclusion has been reached only after a full examination of all rulings in one of the States, and a collection of the current rulings in all jurisdictions for a period of several years." See 2 Wigmore, Evidence § 578.

An example of a "Non-Dead Man's" statute is that of Rhode Island, which provides:

"No person shall be disqualified from testifying in any action at law, suit in equity, or other proceeding at law or in equity, by reason of his being interested therein or being a party thereto." See Rhode Island General Laws 1923, c. 342, § 37, General Laws 1938, c. 537, § 14.

mony was one based on the common law, that is a claim of co-authorship, and was not, as in the instant case, a question of enforcing a right which would have no justiciability whatever, but for a federal statute.

Similarly, in In re Falk, 83 F.Supp. 817 (D.C.), aff'd 180 F.2d 562 (2nd Cir.), the dead man's statute was stated to be applicable in a bankruptcy matter without discussion as to the effect of Rule 43(a). The proffered testimony was, however, admitted under an interpretation bringing it within one of the many exceptions grafted upon the statute by more than 200 years of case law, and so this statement is *dictum*. See also United States Rubber Co. v. Consolidated Trimming Corp., 218 F.Supp. 498, 509 (D.C.), in which testimony as to personal transactions with a deceased inventor were held not barred, under the particular circumstances of the case, although the statute was assumed to be applicable.

While the issue may not be free from doubt, there are certainly strong policy reasons to desire a uniformity of disposition of cases involving a purely federal right granted solely by act of Congress, and which would not exist at all at common law or in the absence of the federal statute. It is unconscionable to assume that, contrary to the clear literal mandate of Rule 43(a), a state statute relating to competency of witnesses could operate so as to give a different result to litigants asserting a federal right in this District, than would be enjoyed in any of the other states which have no dead man's statute at all, or where there are slightly different shades of meaning and interpretation attached to any such exclusionary rule which may exist.

Further, a respectable weight of legal scholarship holds that the stated policy reasons for the dead man's statute, grounded primarily upon excluding perjurious testimony, are contrary to all experience. As stated in Weinstein, Korn and Miller, New York Civil Practice, Sec. 4519.07:

> "The dead man's statute deliberately impedes the court's search for the truth on the grounds that judges and jurors are not capable of properly assessing credibility."

The earliest reports (c. 1740) which contain accounts of witnesses testifying to the jury, are devoid of any information as to grounds for challenging them. See Thayer, Cases on Evidence, 1066 (2nd Ed. 1900). Coke, however, attaches certain qualifications to the assertion of the older judges that "they had not seen witnesses challenged." He mentions as grounds of exclusion, legal infancy, being an "infidel", of non-sane memory, "not of discretion", a "party interested", "or the like." He also pointed out that in addition to the rules as to spousal incompetency, "he that challengeth a right in the thing in demand cannot be a witness."

Precedent from the time of Elizabeth I onward indicates that ordinarily a party could not testify in his own favor in the common law courts. Since a witness was incompetent to testify in his own behalf, the law, as a counterbalancing measure, allowed him to claim the privilege not to testify against himself. Indeed, the criminal law forbade the defendant to testify. The common law courts and theorists opined that as to non-parties, any witness was disqualified if he had an immediate legal interest in the outcome of the lawsuit, or if the record might be used as evidence for or against him in any subsequent legal proceeding.

In English Courts the Dead Man's Statute was abandoned more than a century ago. Reasoning as the following, no doubt, led to its ultimate demise:

> "Now plain sense and reason would obviously suggest that only living witnesses who could throw light upon a fact in issue should be heard to state what he knows, subject always to such observations as may arise as to his means of knowledge or his disposition to the trust. . . . It is painful to contemplate the amount of injustice which must have taken place under

the exclusive system of the English, not only in cases actually brought into court and there wrongly decided and in consequence of the exclusion of evidence but in numberless cases in which parties silently submitted to wrongs from inability to avail themselves of proof, which, though morally conclusive, was in law inadmissible." Second Report of Her Majesty's Commission for Inquiry into the Process, Practice and System of Pleading in Superior Courts of Common Law 10 (1853).

The Dead Man's Statute is apparently predicated upon the notion that one who has had business dealings with a decedent would most likely lie about the facts and circumstances of the transaction when it would be advantageous to him, since the decedent is no longer available to contradict in-court testimony. The New York statute is enforced only when a party or person interested in the event or a person from, through or under whom such party or interested party derives his interest, by assignment or otherwise desires to testify in his own behalf against the estate of the decedent as to a transaction with the decedent. Jeremy Bentham, as long ago as 1827, wrote that " . . . the reason which forbids admission of the testimony, is weaker in (the case of a party-witness) than in the case of an interested extraneous witness. . . . In the case of a party the interest is more palpable; the objection created by it is likely to act with greater force upon the judicial faculties of the magistrate; his mind is more surely open to it; the danger of deception is therefore less." 5 Bentham, Rationale of Judicial Evidence 351 (1827).

In 1958 the New York Advisory Committee proposed that the rule be abolished. In its stead the Committee recommended that any statements made on personal knowledge by the deceased, whether oral or written, should be admissible. The following provision was recommended:

"In weighing such evidence and testimony in such a case the judge or jury shall take into account the inability of the deceased . . . to contradict a witness and the fact that the deceased . . . is not subject to cross-examination." 2 N.Y.Adv. Comm.Rep. 268–70.

The Advisory Committee noted the purpose of the rule and wrote that "The Statute achieves this protection of the dead against possible injustice to their estates through perjury accepted by naive triers of fact, at the expense of the honest living whose mouths are stopped from proving valid claims. It has created enormous difficulty in litigation and has been condemned by every modern student of the law of evidence." See 2 Wigmore, Evidence §§ 578, 578a (3rd Ed. 1940); McCormick, Evidence § 65 (1954).

The Court holds the testimony of the plaintiff competent as against both defendants. But for the admissability of such evidence, plaintiff's cause of action will fall as against the deceased registered representative, although not against the corporate defendant, and that portion of the judgment hereinafter directed to be entered against the estate of the decedent would be without legal basis.

### III

#### The Measure of Damages

In pursuance of what the Court finds to be an illegal scheme, plaintiff was induced to sell certain stocks, and bought two other issues. Her damages must be compensatory only, and comprise all consequences flowing directly from the statutory breach.

Plaintiff sustained or recognized a "real loss" for tax purposes, that is to say, she sold her portfolio for $8,233.56 less than its historical cost or tax basis. Plaintiff probably received some tax deduction for this loss but the resulting tax saving in 1964 would have been minimal unless she had countervailing

gains, or a substantial net taxable income from other sources. Plaintiff asserts that she realized no substantial tax benefits from this loss. Had plaintiff held the stocks until December 31, 1965, an arbitrary date selected by her for purposes of this litigation, she says she would have realized a profit of approximately $42,000.00 over historical cost, had she also actually sold on that date. Plaintiff seeks to recover these damages.

■ These facts do not provide a reasonable basis for computing damages. Damages based upon realizing a tax loss, which was inchoate, or a "paper" loss, at the time she consulted decedent, are too speculative to be a basis for recovery. Plaintiff's securities had already declined in value when she received the advice. Similarly, the date of December 31, 1965, selected by plaintiff as the date to which she hopefully would have held her original investments, and then sold, were it not for defendants' conduct, and realized a substantial profit, is unsupported by any evidence and unrealistic in the extreme.

A measure of damages based on the monetary loss actually and proximately resulting from the acts complained of will be adequate. Restatement, Torts, § 549, Loss, *supra*, pp. 1630 and 1793.

I find that during December, 1964, plaintiff's dissatisfaction with her participation in the scheme to which she had become a knowing party ripened into the actual removal of her account from Walston. The actual date during December of 1964 is not a matter of record.

As to the two stocks purchased through defendants, these were actually sold during 1964 at a net loss of $134.22. The balance of plaintiff's damages shall be computed on the assumption that within a reasonable time after December, 1964 she should have repurchased the stocks so as to minimize her damages. Based on all the facts and circumstances of this case, the Court finds that such repurchase should have been effected no later than January 28, 1965. On that date, plaintiff would have paid

the following approximate prices (Details omitted).

Defendants' liability shall be joint and several and will be increased by the brokerage and related costs of purchase and the amount of any dividends missed on the stocks sold, less those received on the two issues purchased. These are purely matters of computation. Plaintiff should not be denied relief because she tried her case on an erroneous theory of damages, when these matters are readily ascertainable from regularly published securities data, of which this Court may take judicial notice, or may be ascertained by computation.

The foregoing constitutes findings of fact and conclusions of law of the Court in this case.