Sullivan C. **RICHARDSON**, Plaintiff-Appellee,

v.

John W. **MacARTHUR** et al., Defendants-Appellants.

No. 348–70.

United States Court of Appeals, Tenth Circuit.

Nov. 1, 1971.

Rehearing Denied Dec. 3, 1971.

36

George W. Hopper, Denver, Colo. (Mc-
Kay & Burton, Salt Lake City, Utah,
White & Steele, Denver, Colo., on the

brief), for defendant-appellant, Bonneville-Sylvan Life Insurance Co.

C. Keith Rooker, Salt Lake City, Utah (David L. Gillette and Dale A. Kimball, Salt Lake City, Utah, on the brief), for plaintiff-appellee.

Before HILL and JONES,* Circuit Judges, and BROWN, District Judge.

HILL, Circuit Judge.

Appellee Richardson recovered a judgment for $178,700.32 against appellant Bonneville-Sylvan Life Insurance Company. The case was tried to a judge sitting without a jury, and it is the trial judge's findings of fact and conclusions of law which form the basis of Bonneville's direct appeal to this court.

Appellee's amended complaint stated five claims, including two claims against John and Hazel MacArthur and three claims against appellant Bonneville and the MacArthurs jointly. Prior to trial, appellee dismissed the action against MacArthurs without prejudice, pursuant to an agreement that the MacArthurs would release their claim of $50,500 against appellee. Of appellee's claims against appellant Bonneville, one alleged a violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j and Rule 10b–5, 17 C.F.R. § 240.-10b–5 promulgated by the Securities and Exchange Commission. It was upon the alleged securities act violation that the trial court found for appellee and granted judgment against appellant Bonneville. This appellate court's mission is to review for correctness the trial court's findings and conclusions entered to support the judgment.

Under Rule 52 F.R.Civ.P., 28 U.S.C., we are bound by the trial judge's fact findings unless they are clearly erroneous. Our close examination of the record upon appeal discloses no clear error in this regard, and we proceed to outline the pivotal evidence adduced at the trial.

Bonneville-Sylvan was originally incorporated in Utah in 1958 as Bonneville Life Insurance Company. The original stock offering of the fledgling insurance company was an intrastate offering restricted to residents of Utah and therefore exempt from registration under the Securities Act of 1933. The capital stock was underwritten by Pacific Securities Company and was marketed on a subscription basis whereby a subscriber could pay cash or could pay over a period of time on a monthly installment basis. John MacArthur was an employee of Pacific Securities and was responsible for selling the lion's share of the subscriptions for Bonneville's stock. By February, 1960, Bonneville's original offering was fully subscribed. Thereafter, because of his success in the underwriting, MacArthur was hired by Bonneville and was placed in charge of organizing Bonneville's business in California.

By June, 1961, appellee Richardson, a California resident, had become interested in Bonneville. He contacted the Utah offices of Bonneville expressing an interest mainly in their stock, but with some additional indication that he was also interested in selling their insurance. Richardson was advised to contact Mac-Arthur to discuss an association with the company in California. Richardson and MacArthur met and discussed Bonneville's stock and insurance; subsequently they agreed to associate in the development of Bonneville's insurance business in California. At the same time, Richardson's investment interest in Bonneville stock continued, and this was well known to MacArthur.

After working together for only a short time, Richardson and MacArthur formed a close relationship and bond of trust. Accordingly, on August 25, 1961, Richardson and MacArthur entered into a written agreement whereby in consideration of $33,500 MacArthur conveyed to Richardson his equity in 2000 shares of subscribed stock in

* Of the Fifth Circuit, sitting by designation.

Bonneville. Previously, in late 1960 and early 1961, MacArthur had acquired an equity interest in many shares of subscribed stock, when it had become apparent that many of the original subscribers to Bonneville's capital stock issue were not going to be able to meet their schedule of payments for the subscribed stock. Having sold a large number of subscriptions, MacArthur knew many of the subscribers and, with the knowledge of Bonneville, he began acquiring assignments of those individuals' unpaid subscriptions. One of his admitted purposes for acquiring the subscription rights was to utilize the shares as sort of a quasi stock option plan to entice prospective agents into the California agency.

By the terms of the contract whereby Richardson was to pay $33,500 for MacArthur's equity in the subscribed stock, it was also agreed that Richardson would pay $68,000 to Bonneville, which was the amount of the original subscription price of the stock which remained unpaid and owing to Bonneville. At the time of the agreement, Richardson was able to pay MacArthur $20,000, but subsequently it developed that Richardson was unable to raise the rest of the purchase price. Therefore, MacArthur and Richardson reached a new accord whereby it was agreed that Richardson would take only 1500 shares. Accordingly his purchase price to MacArthur was reduced to $25,000 and the amount payable to Bonneville to exercise the subscription rights to the 1500 shares was reduced to $50,500.

Under the modified agreement, Richardson was able to pay MacArthur an additional $5,000 and this, coupled with the previous $20,000 payment, completed Richardson's payment to MacArthur for MacArthur's equity in the subscriptions. Bank financing was arranged to cover the remaining $50,500 which Richardson owed Bonneville. In this regard, on November 29, 1961, MacArthur arranged for a loan of $125,000 from the Union Bank in Los Angeles on a note signed by MacArthur and Richardson. The proceeds of the loan were used in part to pay the $50,500 necessary to exercise the subscription rights on Richardson's 1500 shares and, in addition the proceeds of the loan provided sufficient capital for MacArthur to exercise his subscription rights on 2200 additional shares of Bonneville stock. In short, the transaction was this: MacArthur and Richardson jointly signed a note for $125,000; the bank deposited the proceeds in MacArthur's account; MacArthur wrote a check to Bonneville for $125,000 to free 3700 shares of original issue capital stock; Bonneville then issued 3700 shares of stock in MacArthur's name; and, lastly, by prearrangement, Bonneville sent the stock to the Union Bank to be held as the bank's collateral on the loan.

For some unknown reason, the $125,-000 note was shortly replaced by two smaller notes. One note in the sum of $50,500 was signed by Richardson as the principal obligor with MacArthur apparently signing as a guarantor. The second note was for $74,500 and it was signed by MacArthur alone. At the bottom of the respective notes a notation was made that 1500 shares of Bonneville stock secured Richardson's note, and 2200 shares secured MacArthur's note.

Although Richardson made no payments on the note reducing the principal, he continuously paid the monthly interest on his note through the due date of May 28, 1962. Richardson testified that around the due date on the note, MacArthur contacted him and related that the SEC was investigating Bonneville to determine if the intrastate registration exemption had been violated.[1] For

---

1. Additional evidence showed that in fact the SEC did investigate Bonneville to determine whether its stock was being sold to non-residents of Utah in violation of the registration exemption and whether §

10(b) was being violated. In response to this investigation, Bonneville's attorneys advised the company to take extensive steps to review all subscription agreements which had been subsequent-

this reason, MacArthur said it was necessary to remove all documentary evidence that Richardson, who was not a Utah resident, was the actual owner of 1500 shares of Bonneville stock. Hence Richardson was led to believe that he was signing papers so that not only would the stock be in MacArthur's name, but also the notes reflecting the purchase price of the stock would also be in MacArthur's name.

Notwithstanding Richardson's belief that he was signing papers so that his name would be "taken off the note," the evidence showed that what Richardson actually signed was a note which renewed the $50,500 loan until November 29, 1962. Without dispute, Richardson thereafter paid nothing on the $50,500 note, and eventually MacArthur paid the renewal note in Richardson's name. Where MacArthur obtained the funds to pay Richardson's note, along with his own note for $74,500, is none too clear from the record. It appears that some of the funds used for repayment of the notes came from a complex series of transactions with other banks whereby loans were obtained on Bonneville stock and the proceeds were used to retire the notes at the Union Bank. It also appears that Bonneville made advances or loans to MacArthur which were used to reduce the Richardson note. In the final analysis, it was MacArthur who surreptitiously paid Richardson's note of $50,-500, and it was MacArthur who received the 1500 shares that were securing Richardson's note.

After May, 1962, when Richardson supposedly was taken off the note, he made repeated inquiries concerning when the 1500 shares of stock would be transferred into his name. He was reassured by MacArthur that everything was fine and that time would soon be ripe to set straight the transaction to reflect Richardson's interest in the 1500 shares. By December, 1965, the stock price began to rise, and Richardson's inquiries became demands. At this point, Richardson was no longer met with reassurances from MacArthur, and instead it became clear that MacArthur intended to keep the stock.

There are four principal questions on this appeal: (1) Was the action barred by the statute of limitations; (2) was the trial judge's determination that MacArthur perpetrated a fraud on Richardson supported by the record; (3) was appellant Bonneville liable for MacArthur's deeds as a controlling person within the meaning of § 20(a) of the Securities Exchange Act of 1934; and (4) did the trial court utilize the proper measure of damages?

Appellant's contention that the statute of limitations operates as a bar is unfounded. In the pleadings and pretrial order, appellant raised certain California and Utah statutes of limitations as an affirmative defense. Not mentioned was the Utah fraud statute of limitations, 78–12–26(3) Utah Code Annotated 1953, which is the applicable statute.[2] The Utah statute grants three years to bring an action, and the time begins from when the facts constituting the fraud are or should have been discovered. The trial court found that Richardson did not and could not have become aware of the fraud until December, 1965, when Richardson first discovered that MacArthur had no intention of returning the stock. Our consideration of the record has not led us to conclude that the trial court's finding is in clear error. Accordingly, the statute of limitations does not bar this action since this action was commenced within three years after December, 1965.

ly acquired by the original underwriters or its salesmen, the purpose of the review being to forestall activities which might constitute Securities Act violations. Despite the advice from its attorneys, it appears that Bonneville's only action was to notify such salesmen, including MacArthur, that Bonneville stock could not be sold to non-residents of Utah for two years.

2. Mitchell v. Texas Gulf Sulphur, 446 F.2d 90 (10th Cir. 1971).

**40**

With respect to the fraud issue, appellant contends that the evidence merely shows that MacArthur refused to sign the stock over to Richardson because Richardson failed to pay off the note to the Union Bank. In short, appellant contends that there is nothing more involved here than a contract dispute.

Although this case at first glance may give the appearance of being simply a dispute over the performance of a contract, a closer look at the evidence shows far more than this. Various aspects of the evidence closely examined give light to a scheme by MacArthur to convert Richardson's stock and a corresponding lack of intent to follow through on the contract with Richardson.

■ Before focusing on the evidence which discloses such a scheme, we must digress for a moment to make clear that such a course of conduct is within the fraud prohibitions of § 10(b) and Rule 10b–5. To be sure, we are not dealing here with the garden variety of securities fraud involving deceit as to the actual value of securities bought or sold. However, Rule 10b–5 is a remedial measure of far greater breadth than merely prohibiting misrepresentations and non-disclosures concerning stock prices.[3] No attempt is made in 10b–5 to specify what forms of deception are prohibited; rather, *all* fraudulent schemes *in connection* with the purchase and sale of securities are prohibited.[4]

■ Notably, the broad sweep of the prohibition in 10b–5 has been held to include a scheme whereby loans were extended to an individual to finance a stock purchase, with the ultimate intent of converting from that individual the stock so purchased.[5] Similarly, 10b–5 has been found to be a proper civil remedy for a scheme whereby individuals were induced into contracting for the purchase of stock which the seller had no intention of giving up.[6] The latter scheme was not viewed merely as a dispute concerning the performance of a contract but was deemed a possible fraud actionable under 10b–5. In short, whether the failure to follow through on an agreement to purchase or sell stock is a mere breach of a contract or whether it amounts to a manipulative or deceptive device, or a contrivance in contravention of § 10(b) depends upon the facts and circumstances developed at trial.[7]

Moving to an analysis of the evidence, the critical fact is that Richardson paid MacArthur $25,000 for MacArthur's equity in the subscription rights to 1500 shares. At that moment MacArthur's interest in the 1500 shares was extinguished and Richardson's ownership in the stock was complete, subject only to a payment of $50,500 to Bonneville as the last installment payment on the subscription.

Notwithstanding that MacArthur had no remaining interest in the 1500 shares, he arranged for the loan that in part paid the $50,500 amount which Richardson owed Bonneville. As part of this transaction, he arranged for the newly issued 1500 shares to be issued in his name alone. Moreover, he arranged to be a party to Richardson's note. Whatever altruistic appearances these activities may yield, it is nonetheless true that by these activities MacArthur emerged in a position to deal freely

---

3. *Accord* Stevens v. Vowell, 343 F.2d 374 (10th Cir. 1965).

4. A. T. Brod & Co. v. Perlow, 375 F.2d 393 (2nd Cir. 1967).

5. Cooper v. North Jersey Trust Company of Ridgewood, N.J., 226 F.Supp. 972 (S.D.N.Y.1964); *accord* Glickman v. Schweickart & Co., 242 F.Supp. 670 (S.D.N.Y.1965); *but see* Meisel v. North Jersey Trust Company of Ridgewood, N.J., 218 F.Supp. 274 (S.D.N.Y.1963).

6. Commerce Reporting Company v. Puretec, Inc., 290 F.Supp. 715 (S.D.N.Y. 1968); *see* Allico Nat. Corp. v. Amalgamated Meat Cutters & Butcher W., 397 F.2d 727 (7th Cir. 1968).

7. A. T. Brod & Co. v. Perlow, *supra*; *see also* Dauphin Corporation v. Sentinel Alarm Corporation, 206 F.Supp. 432 (Del.1962).

with the stock and the underlying indebtedness, despite the fact that he no longer possessed any ownership interest in the stock.

This brings us to the time period around May 28, 1962, when the original $50,500 note was supposed to be due. At this time Richardson was induced into what he believed to be a transfer and modification of the loan to take his name off the loan. Richardson was led to believe that this was legal and necessary so that the SEC would not find 1500 shares of Bonneville stock in the hands of a California resident. What actually happened, of course, was that Richardson signed papers that, far from taking him off the loan, merely renewed the loan past May 28, 1962. The upshot of this is that while Richardson's loan was in fact merely extended for six months, he was led to believe that he need no longer take any interest in what was happening to the loan.

At this stage of the events, there is some confusion concerning how the loan was paid off. Some parts of the bank records reflect that a $16,000 payment was made on the loan as early as December 14, 1961, while other records reflect that the first payment was not made until July or August 2, 1962. In any event, it is clear that the $16,000 payment on Richardson's note was made by MacArthur without Richardson's knowledge. Subsequently MacArthur made other payments on the loan without Richardson's knowledge, which eventually extinguished the note and thereby freed the 1500 shares in MacArthur's name. During this period of time and thereafter until December, 1965, MacArthur reassured Richardson that the matter of his 1500 shares of stock would be set

straight in time although it appears that by April, 1965, MacArthur had placed all of the shares held by Union Bank in his wife's name. Moreover, Mrs. MacArthur's trading account containing the Bonneville stock was very active, exclusively on the selling side, through December, 1965.

In the final analysis, MacArthur's efforts and success in freeing the stock in his own name despite the fact that previously he had been paid $25,000 for his entire interest in the 1500 shares, gives credence to the trial court's finding that MacArthur acted fraudulently to induce Richardson into giving MacArthur control over the loan and stock, with MacArthur's ultimate intent being the conversion of Richardson's stock. In coming to this conclusion, we have not overlooked certain evidence which supports appellant's view that MacArthur's actions were perpetrated not by fraudulent intent but by what he deemed to be Richardson's default on the contract. However, the evidence, taken *in toto*, is not persuasive of clear error and we uphold the trial court's findings on the issue of fraud.

We turn now to the question of Bonneville's liability for MacArthur's acts. The trial judge found that at all material times Bonneville controlled MacArthur in connection with his activities, and hence Bonneville was liable as a controlling person under § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t.[8] Our scrutiny of the record supports this finding.

Liability under § 20(a) is not restricted by principles of agency or conspiracy.[9] "The statute is remedial and is to be construed liberally. It has been

8. "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person

acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

9. Myzel v. Fields, 386 F.2d 718 (8th Cir. 1967), cert. denied 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143.

interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable."[10] Directing attention to the evidence of Bonneville's relationship with MacArthur, it is plain that Bonneville was a controlling person within the meaning of § 20(a).

MacArthur was the man selected by Bonneville to develop Bonneville in California. In this capacity and with the knowledge and consent of Bonneville's officers, MacArthur not only set up Bonneville's agency in California and obtained certification for Bonneville to sell insurance there, but he also prospected California for mergers and acquisitions. In sum, he dealt with practically any matter affecting Bonneville in California. Since MacArthur regularly reported to Bonneville's executive committee concerning those vast dealings which he was undertaking for Bonneville in California, it cannot now be claimed that Bonneville lacked the influence to control, direct or discipline MacArthur with regard to those dealings.[11]

The evidence is equally strong that Bonneville does not fall under the proviso to § 20(a) which exempts controlling persons who act in good faith and who do not directly or indirectly induce the acts constituting the violation. The record shows that as early as November, 1960, Bonneville officers knew that MacArthur was acquiring assignments of subscription rights. They also knew that he deemed some sort of stock option plan essential to entice prospective salesmen into the California agency. Bonneville officers were aware also that MacArthur was exercising the subscription rights by utilizing bank financing at the Union Bank. By November, 1961, Bonneville had actual knowledge that Richardson was participating with MacArthur in the bank loan secured by Bonneville stock at the Union Bank.

Moreover, during this period of time, Bonneville had actual knowledge that another of MacArthur's stock transactions was in violation of securities law. In that instance, where MacArthur had sold stock to California residents in violation of the securities exemption, Bonneville provided the funds to bail MacArthur out of that illegal transaction. Bonneville also made loans and advances to MacArthur to pay the Union Bank loan, and in other instances officers of Bonneville introduced MacArthur to Salt Lake City banks to obtain additional loans to pay the notes at the California bank. Fundamental to all of this is the absence of any effort on the part of Bonneville to ascertain some specific facts about the complex loan and stock transactions in which MacArthur was so obviously involved. In view of the broad authority which Bonneville granted MacArthur in California, and in the face of the SEC investigation that indicated that Bonneville stock perhaps was being traded improperly (see footnote 1), it was incumbent upon Bonneville to adopt some precautionary measures or internal controls if they now wish to claim that they were operating in good faith.

On the question of damages, we must examine the correctness of granting appellee Richardson $137,500 together with $35,200.32 in interest as actual damages, and $25,000 as exemplary damages. The trial judge arrived at the sum of $137,-500 in damages by determining that a reasonable time within which Richardson could have gone into the market to purchase stock after having become aware of MacArthur's misconduct extended through January 14, 1966. During this period, the highest price on the over-the-counter market for Bonneville stock was $20 per share. This figure was multi-

---

10. Myzel v. Fields, supra, at 738; *see* Moerman v. Zipco, Inc., 302 F.Supp. 439 (E.D.N.Y.1969), aff'd 422 F.2d 871 (2d Cir. 1970).

11. Bonneville's letter to MacArthur instructing him not to sell Bonneville stock for two years (see footnote 1) indeed demonstrates how Bonneville could control MacArthur's dealings specifically with regard to stock transactions.

plied by 6,875 shares [12] to yield $137,500 in damages.

We now reach the final issue, that is, the amount of damages to be awarded under the facts of this particular case.

■ The measure of damages recoverable in actions involving misrepresentations in sales of investment securities is "actual damages on account of the act complained of." Securities Exchange Act of 1934, 15 U.S.C. § 78bb. Esplin v. Hirschi, 402 F.2d 94 (10th Cir. 1968), cert. denied 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459, and Estate Counseling Service v. Merrill Lynch, Pierce, Fenner and Smith, Inc., 303 F.2d 527 (10th Cir. 1962), clearly reflect this Court's opinion as to what we contemplate actual damages to include. In Esplin, 402 F.2d at page 105, we held "the defrauded buyer is entitled to recover the difference between the price paid for the securities with interest from the date of purchase, and the value of the securities determined as of the time of the discovery of the fraud. In addition, the buyer is entitled to recover any additional outlays attributable to the defendant's conduct less dividends or any other payments received from the defendant seller." In Estate Counseling, 303 F.2d at 533, we held that, " 'Actual damages' under the Federal rule of damages for fraud is the 'out of pocket rule.' " The fact that the Esplin and Estate Counseling cases involved misrepresentation as to the value of the securities purchased rather than the fact of purchase as in this case, does not prevent the application of the out of pocket rule to this case.

■ Application of the out of pocket damages rule arises when a disparity exists between what the purchaser thought he was getting and what, in actuality, he finally received. In determining the amount of damages, it is a well recognized rule that the complaining party is entitled to be made whole. That is, he is entitled to be compensated only to the extent that he received less than what he was entitled to under the agreement. He cannot, however, recover in excess of that to which he was entitled in making him whole.

In determining the amount of damages to which Richardson is entitled, the primary concern relates to the *time* at which the damages should be computed. In Esplin we stated 402 F.2d at 104, "the actual extent of the loss sustained may be ascertained as of the date the purchaser realizes, or should realize, that he has been defrauded. It is at this date, when the purchaser discovers the fraud, that he is first in a position to seek redress either through a rescission of the contract, or in an action for damages." A purchaser cannot, however, feign ignorance in the face of obvious fraud with immunity. The question becomes one of fact as to when the existence of fraud became or should have become known. The facts presented show a planned dupery based on allegations of S.E.C. investigations necessitating concealment of Richardson's true interest. Continuous reassurances were made during this period concerning the validity of Richardson's interest. It was not until December, 1965, that MacArthur's usurpation of the subscription rights became apparent.

■ The trial court determined Richardson was entitled to the high selling price of the stock between December, 1965, and early January, 1966. In the recent case of Mitchell v. Texas Gulf Sulphur Company, 446 F.2d 90 (10th Cir. 1971), this Court, under the facts there present, approved a particular price formula for computation of damages. That case and the present case are factually

12. By 1964, the original 1,500 shares of Bonneville stock had gone through a stock split, a merger with the Sylvan Life Insurance Company, a reverse split, and several other complicated transactions that are not necessary to discuss. Resultingly, the 1,500 shares purchased by Richardson in 1961 had become 6,875 shares at all times after December, 1964.

dissimilar. Here, Richardson never had full ownership or possession of the questioned stock, and therefore did not divest himself of the stock because of a violation of the Securities Exchange Act; thus no reason appears here to justify giving him an opportunity to get back into the market within a reasonable time after discovery of the fraud. Damages here must be computed on the basis of the value of the stock on the date the fraud was discovered; that would be sometime in December, 1965.

We also find error in the trial court's computations as to the amount of actual damages. Richardson's obligation was to pay $75,500 for 1,500 shares of stock. He had paid $25,000 to MacArthur, and had secured a loan of $50,500 for the balance, pledging the stock as collateral. We have previously dealt with the manner in which MacArthur surreptitiously succeeded in gaining control of the pledged stock.

During the period up to December, 1965, Richardson, as at least the nominal owner, was entitled to any increments in the stock. This includes any dividends or profits to which he was entitled, as well as any appreciation in value. During this period, the stock first enjoyed a ten for one split. During this period, Richardson sold 1,250 shares to a fellow California resident in a transaction as equally rampant in its obfuscation as all other dealings in connection with this stock. He realized a profit by this sale, and this profit should be included in reduction of his damages.[13] Richardson should not be allowed to retain this profit in silence while pleading to be made whole for his losses.

The trial court, in addition, treated Richardson as the full owner of the entire subscription. To be in that position, Richardson first had to pay the $50,500 loan. The fact is that MacArthur and not Richardson paid the loan. MacArthur, therefore, had a claim for this amount which he could assert against Richardson. The release of this claim by MacArthur should be applied in reduction of the judgment against Bonneville.

Likewise, that portion of the judgment based on the full value of the 6,850 shares would give Richardson an undue windfall. The recovery of the full value has the effect of treating Richardson as owner of the entire quantity. The fact is that Richardson never completed the prerequisite obligation to full ownership —the repayment of the $50,500 loan. He has no claim as owner to the full value of the stock. His only claim is to the increments on that portion of the original 1,500 shares represented by the 6,850 shares to which he now claims he is entitled. The original 1,500 shares should be reduced proportionally to reflect the sale of the 1,250 shares of the 15,000 shares. He is entitled to the increments on this portion.

The rule of measure of damages in this case should be the amount of actual monetary outlay, together with the increments on that portion of the original subscription as represented by the present claim. These increments would include any dividends, profits or appreciation attributable to the stock between the time of Richardson's original connection and the time when the fraud was or reasonably should have been discovered. This should then be reduced by any dividends, profits or other payments actually received in transactions involving the stock, together with the settlement of claims against the purchaser by which he is benefited. In this manner we recognize Richardson in his true position— the nominal owner for purposes of collection of interim increments to the stock,

---

13. "* * * the buyer is entitled to recover any additional outlays attributable to the defendant's conduct *less dividends or any other payments* received from the defendant seller." (Emphasis added). Esplin v. Hirschi, 402 F.2d 94, 105 (10th Cir. 1968), cert. denied 394 U.S. 928, 89 S.Ct. 1194.

but not the owner in fact as to his claim for the full value of the stock.

The trial court's allowance of $25,000 as exemplary damages is urged by the appellant to be violative of the damages authorized by statute. It is his contention that Meisel v. North Jersey Trust Co., 216 F.Supp. 469 (S.D.N.Y. 1963), represents the proper limitation. It was there stated that 15 U.S.C. § 78bb(a) (§ 28(a), Securities Exchange Act) prevents imposition of punitive damages by limiting recovery to never more than the plaintiff's "actual damages". We are well aware of cases involving the Securities Exchange Act which would appear to allow punitive damages despite this limitation.[14] These decisions, however, reflect the additional factor of the conduct constituting violation of Rule 10b–5 to be of such contumacy as to permit recovery for tortious conduct for fraud and deceit. Gann v. Bernzomatic Corp., 262 F.Supp. 301 (S. D.N.Y.1966). We feel the limitation on recovery contained in 15 U.S.C. § 78bb (a) is clear and binding in this case. We therefore feel constrained to follow the Second Circuit's decision in Green v. Wolf Corp., 406 F.2d 291, 302 (2d Cir. 1968), cert. denied, Troster, Singer & Co. v. Green, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 where it was held that § 78bb(a) "limits recovery in private suits for damages to 'actual damages'." [15]

The judgment of the trial court is affirmed on the issue of liability. That part of the judgment awarding damages is set aside, and the case is remanded for a new trial on the issue of damages only, in accord with this opinion. The trial court, at the conclusion of such new trial, shall make appropriate findings of fact and conclusions of law consistent herewith.

14. deHaas v. Empire Petroleum Co., 302 F.Supp. 647 (Colo.1969); Hecht v. Harris, Upham & Co., 283 F.Supp. 417 (N.D. Cal.1968).

15. See also Myzel v. Fields, 386 F.2d 718 (8th Cir. 1967), cert. denied 390

U.S. 951, 88 S.Ct. 1043; Pappas v. Moss, 257 F.Supp. 345 (N.J.1966), rev'd on other grounds 393 F.2d 865 (3rd Cir. 1968).