Robert **ABRAHAMSON** and Marjorie Abrahamson, Plaintiffs,

v.

Malcolm K. **FLESCHNER** et al., Defendants.

No. 71 Civ. 344.

United States District Court, S. D. New York.

March 4, 1975.

Shea, Gould, Climenko & Kramer by Ronald H. Alenstein, New York City, for plaintiffs.

Sullivan & Cromwell by Richard E. Carlton, New York City, for defendants Malcolm K. Fleschner, William J. Becker, Fleschner Becker Associates.

Hill, Betts & Nash by Mark M. Jaffe, New York City, for defendant Harold B. Ehrlich.

D'Amato, Costello & Shea by Richard G. McGahren, Kenneth A. Sagat, New York City, for defendant Harry Goodkin & Co.

## OPINION

ROBERT L. CARTER, District Judge.

Plaintiffs, Marjorie and Robert Abrahamson, are former limited partners of defendant Fleschner Becker Associates ("FBA"), an investment partnership. In addition to suing the limited partnership, plaintiffs also bring this action against three general partners of FBA and the firm of certified public accountants which audited the books of FBA for the fiscal years 1966, 1967, and 1968. Generally, the plaintiffs allege acts of securities fraud. Specifically, they assert violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and of Rule 10b–5 promulgated thereunder, and of Section 206 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–6. Federal jurisdiction is based upon Section 27 of the 1934 Act, 15 U.S.C. § 78aa, and Section 214 of the Investment Advisers Act, 15 U.S.C. § 80b–14.

Plaintiffs' principal claim is that defendants concealed from them that an enormous percentage of FBA's portfolio consisted of unregistered or restricted securities.[1] Plaintiffs allege that in 1970 they withdrew from FBA as soon as they learned of FBA's disproportion-

---

1. "Restricted securities" are securities acquired directly or indirectly from an issuer or its affiliates in a transaction not involving a public offering. Absent registration, such securities are subject to restrictions regarding any later public sale. *See generally* SEC Securities Act Release No. 5223 (January 11, 1972).

ate investment in unregistered securities, but claim they received far less than they would have received had they been informed of the truth earlier and withdrawn at the end of an earlier fiscal year. It is asserted that the concealment of the true facts concerning FBA's investments resulted in damages to them in excess of $1,000,000.

*Background Facts*

The following facts are not in dispute. On or about July 1, 1965, plaintiffs became limited partners of FBA (then known as The Fleschner Co.) following several conversations with defendant Malcolm Fleschner in late 1964 and in 1965. In those conversations, plaintiffs expressed their concern for financial security and conservatism in investment; Fleschner, in turn, expressed his intent to create an investment partnership with a conservative investment policy.

FBA was started as a small partnership. By April, 1966, it grew to 35 limited partners, and by October, 1968, it had at least 66 limited partners. Defendant Fleschner, the person responsible for FBA's formation, was at all times a general partner of FBA. Defendant William Becker was a general partner at all times after April, 1966; and defendant Ehrlich was a general partner from October, 1968, to September, 1969. The defendant Harry Goodkin & Co. ("Goodkin") was the aforementioned firm of accountants. Year-end financial statements were certified by Goodkin and mailed to plaintiffs. Balance sheets were contained in the financial statements indicating FBA's investment in securities. The securities were not itemized in the statements for fiscal 1967 and 1968. The figure in the balance sheets showing FBA's securities investment was designated "market value." Goodkin sent drafts of the certified financial statements to the general partners of FBA for their review before it mailed them to the limited partners.

The general partners also mailed monthly reports to FBA's limited partners. Those reports were mostly concise, one-page statements setting forth the percentage increase or decrease in the value of FBA's investments for the year to date and comparing this performance with the Standard & Poor's 500 Stock Average activity within the same period. The report also contained comments characterizing FBA's overall approach to investment opportunities as "low risk" or "conservative."[2]

During the period September, 1967, through September, 1968, FBA increased its investment in unregistered securities from approximately 15% to approximately 72%[3] of its portfolio. During this time the monthly reports sent to plaintiffs and all other limited partners uniformly described the company's "investment posture" as "most conservative."

Between September, 1968, and September, 1969, FBA's investment in unregistered securities fluctuated from about 72% to 88% of its portfolio. The monthly reports made no mention of the unregistered securities. In either December, 1969, or January, 1970, plaintiffs received the year-end financial statements for September, 1969, prepared by a new accounting firm, and a footnote to the statements revealed that approximately 77% of FBA's total investment in securities consisted of unregistered securities. Allegedly learning

2. The following are some examples of those comments:

"We continue to maintain a low risk stance." (Report dated November 2, 1967);

"We remain in a most conservative posture." (Report dated December 1, 1967);

"We have maintained the previously mentioned low risk stance through the current market weakness." (Report dated February 2, 1968); and

"Our investment posture remains most conservative." (Report dated April 2, 1968). Plaintiffs' Memorandum at 7–8.

3. There really is no dispute concerning these figures. Defendants FBA, Fleschner and Becker merely contend that the percentage calculations should be based on the total value of FBA's invested assets, rather than limiting the denominator to investments in securities.

of this fact for the first time, plaintiffs withdrew at the earliest possible time after receiving the 1969 statements, that is, September, 1970.

It is undisputed that the following figures represent the capital contributions, interim withdrawals and final distributive shares of the plaintiffs:

### Robert Abrahamson

| Date | Capital Contributions | Withdrawals |
|---|---|---|
| July 1, 1965 | $150,000.00 | |
| Sept. 30, 1967 | | $ 8,000.00 |
| Sept. 30, 1968 | | 32,500.00 |
| Sept. 30, 1969 | | 70,000.00 |
| Sept. 30, 1970 | | 45,500.00 |
| Distributive share on withdrawal from the partnership | | 150,097.00 |
| TOTALS | $150,000.00 | $306,097.00 |
| Net Profit | $156,097.00 | |

### Marjorie Abrahamson

| Date | Capital Contributions | Withdrawals |
|---|---|---|
| July 1, 1965 | $180,000.00 | |
| Oct. 1, 1966 | 2,652.22 | |
| Sept. 30, 1967 | | $ 57,015.70 |
| Oct. 1, 1967 | 266,847.13 | |
| Sept. 30, 1968 | | 58,000.00 |
| Sept. 30, 1969 | | 52,500.00 |
| Sept. 30, 1970 | | 73,500.00 |
| Distributive share on withdrawal from the partnership | | $341,565.00 |
| TOTALS | $449,499.35 | $582,580.70 |
| Net Profit | $133,081.35 | |

Plaintiffs' claim of damages in excess of $1,000,000 results from comparing what they actually received when they withdrew from FBA, and the amount they would have received if they had withdrawn as of the end of September, 1968. They assert that they would have withdrawn earlier but for defendants' failure to divulge the existence and extent of FBA's investment in unregistered securities and the omission of this information in the year-end and monthly reports mailed to them. They claim reliance on the statements, reports, and personal representations of Fleschner in retaining their investment in FBA until 1970.

### Discussion

All defendants have moved for summary judgment pursuant to Rule 56, F. R.Civ.P., and all defendants have joined in the following contentions: 1) that plaintiffs have suffered no damages; 2) that the FBA agreement of limited partnership signed by plaintiffs authorized the purchase of securities of every kind; 3) that plaintiffs were entitled to in-

spect FBA's books and records and, therefore, are chargeable with constructive knowledge of the existence of FBA's investment in unregistered securities; and 4) that defendants were not "investment advisers" within the meaning of the Investment Advisers Act of 1940. Additionally, defendant Goodkin claims that there were no material nondisclosures in connection with the purchase or sale of a security within the meaning of Rule 10b–5, and that Goodkin did not act in concert with the other defendants. Defendant Ehrlich contends that if any wrongdoing occurred, it did not take place while he was a general partner of FBA.

Plaintiffs have also moved for summary judgment. They assert: 1) that their withdrawal from FBA constituted a "sale" of a "security"; 2) that the alleged nondisclosure occurred "in connection with" the purchase or sale of a security; 3) that the defendants' nondisclosure of FBA's investment in unregistered securities was a concealment of a material fact; and 4) that "causation" is presumed from the alleged materiality of the nondisclosure.

Defendants' motions for summary judgment must be granted. While summary judgment is not generally favored in this Circuit, and is sparingly granted in complicated securities cases, see, e. g., Schoenbaum v. Firstbrook, 405 F.2d 215 (2d Cir. 1968) (en banc), cert. denied, Manley v. Schoenbaum, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969), this case presents a situation where summary judgment is appropriate. "The motion will be granted when it raises at least one legally sufficient defense that would bar a plaintiff's claim and involves no triable issue of fact." Wright & Miller, Federal Practice and Procedure, Civil § 2734, at 647–48 (3d Ed. 1973). Plaintiffs have suffered no damages and hence have failed to state a cause of action under

the Securities Exchange Act of 1934 or the Investment Advisers Act of 1940.

In granting defendants' motions, it is only necessary to consider the primary contention raised by all defendants, that the figures representing plaintiffs' contributions, withdrawals and distributive shares plainly show that plaintiffs have suffered no economic injury enabling them to succeed in an action for damages under Rule 10b–5 or Section 206. Plaintiffs concede that the total amounts received from FBA exceed their capital contributions. However, they urge three alternative arguments to support their contention that they are entitled to the difference between the amount they would have received if they had terminated their partnership interests in 1968, and the amount they actually received in 1970.

The first argument is that many of their interim FBA withdrawals were withdrawals of partnership income which should not be counted in determining gain or loss upon liquidation of their interests. Secondly, it is argued that even if all withdrawals are counted in determining the amount received, with a net gain thereby resulting, case law requires awarding them damages in the sum claimed. Finally, they assert that a cause of action which may fail for want of damages under Rule 10b–5 does not necessarily fail under the Investment Advisers Act.

### 1. *The Nature of the Withdrawals*

In sum, plaintiffs submit that many of the interim withdrawals consisted of their share of partnership income, akin to the receipt of dividends on stock or of interest on bonds, such sums allegedly being immune from profit/loss calculations in a Rule 10b–5 suit. Because of this purported similarity, it is contended that certain withdrawals should be ignored in determining damages.[4] Defendants counter with a three-fold re-

4. Even if all the interim withdrawals are deducted, Robert Abrahamson would still have a net gain of $87.00. However, similar total deductions would leave Marjorie Abrahamson with a net loss of $107,834.35.

sponse: first, the limited partnership interests were not interest-bearing or dividend-paying, and any interim withdrawals were actually deductions from the Abrahamsons' capital accounts; second, the 1967 and 1968 financial statements for FBA reveal net ordinary loss-. es, thereby refuting plaintiffs' claim of withdrawal of partnership *income*; and third, the characterization of the withdrawal is irrelevant in any event, for payments of any type received from a defendant must be taken into account in computing a plaintiff's damages.

It is unnecessary to decide the proper characterization of some or even all of the withdrawals, for all payments to plaintiffs, be they considered dividends or interest, must be counted in determining the amount of actual loss that can be recovered in Section 10(b) litigation.

Few cases have arisen concerning the measure of damages in Rule 10b–5 actions, and none at all concerning the inclusion of interim withdrawals from a limited partnership; I am persuaded that in determining what damages, if any, plaintiffs have suffered, the inclusion of plaintiffs' withdrawals are required. In Fershtman v. Schectman, 450 F.2d 1357 (2d Cir. 1971), cert. denied, 405 U.S. 1066, 92 S.Ct. 1500, 31 L. Ed.2d 796 (1972), the court could find no damages where a hypothetical limited partner making an initial capital contribution of $10,001.00 would have been repaid $6,600 and would have been entitled to receive $13,426.75 in profits on his diminishing capital balance.

More particularly, the Tenth Circuit has held in a suit for damages under Rule 10b–5 that a buyer [5] "is entitled to recover any additional outlays attributable to the defendant's conduct *less dividends or any other payments* received from the defendant seller," Richardson v. MacArthur, 451 F.2d 35, 44 n. 13 (10th Cir. 1971), *quoting* Esplin v. Hirschi, 402 F.2d 94, 105 (10th Cir. 1968), cert. denied, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969); *cf.* Fox v. Glickman Corp., 253 F.Supp. 1005 (S.D.N.Y. 1966) (dividends paid by corporation to plaintiff had to be included in the damages determination, but the court characterized the dividends as a return of capital which was not taxable to the stockholders).

In *Richardson*, the plaintiff had to deduct all dividends and other payments which he received by virtue of possession of stock sold to him by the defrauding seller; the plaintiff also had to deduct all profit which was made in sales of the stock to other buyers. In Schaefer v. First National Bank, 326 F.Supp. 1186 (N.D.Ill.1970), appeal dismissed, 465 F.2d 234 (7th Cir. 1972), another buyer's action for damages under Rule 10b–5, named plaintiffs in a class action received consideration in return for an agreement not to execute a judgment against certain defendants. These payments were counted by the court in computing the named plaintiffs' damages. Because the inclusion of the payments resulted in no damages, the securities act count was dismissed. Finally, in Twomey v. Mitchum, Jones & Templeton, Inc., 262 Cal.App.2d 690, 69 Cal. Rptr. 222 (1968), in a suit brought by the plaintiff customer against the defendant brokerage firm, the court in computing the plaintiff's losses included dividends received and profits made from the sales of stock.

---

5. Plaintiffs have consistently maintained that the termination of their partnership interests was a "sale" of securities. However, they also argue that the execution of their 1968 partnership agreement can be viewed as a "purchase" of securities. Plaintiffs' Memorandum at 44. Consequently, there is no need to consider any possible difference regarding the measure of damages in a buyer's Rule 10b–5 suit versus a seller's suit, though there is little likelihood that any difference remains in this Circuit. *See* Zeller v. Bogue Electric Manufacturing Corp., 476 F.2d 795 (2d Cir.), cert. denied, 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973).

■ No case law has been discovered or cited which convinces the court that plaintiffs' interim withdrawals should not be counted in determining their gain or loss. In determining the extent of the 10(b) damages recoverable which is the difference between what they invested in FBA and what they received, the withdrawals must be considered. For Robert Abrahamson, his total withdrawals added to $306,097.00; when compared to his capital contributions, it is determined that Robert Abrahamson received $156,097.00 in profit. Marjorie Abrahamson's withdrawals totaled $582,580.70, giving her a profit of $133,081.35 over her capital contributions.

## 2. The Measure of Damages in a 10b–5 Claim

The plaintiffs' second argument for both the presence and awarding of damages is that even if withdrawals are counted and result in net gain, and no loss, the law is "plain" that they have suffered damages equal to the difference between what they received upon the termination of their investment in FBA and what they would have received had they terminated at the "appropriate time." The only thing "plain" is that plaintiffs have failed to state a cause of action[6] and have misstated the law.

■ While Rule 10b–5 litigation has increased dramatically in recent years, few cases have been decided on the merits. Consequently, the stage where damages are calculated has rarely been reached. See 3 Bromberg, Securities Law: Fraud, § 9.1, at 225 (1973); Jennings and Marsh, Securities Regulation 1186 (3d Ed. 1972); Cobine, Elements of Liability and Actual Damages in Rule 10b–5 Actions, 1972 Un.Ill.L.Forum 651.

Nonetheless, a "traditional" damages award in 10b–5 actions has developed, and is based on Section 28(a) of the Securities Exchange Act of 1934. That Section reads in part that "no person . . . shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of." 15 U.S.C. § 78bb(a). While "actual damages" has been most often translated as "out of pocket loss," Section 28(a) has been interpreted so as to allow a defrauded buyer to choose recission instead of the difference between the value of what he gave up and the value of what he received, and to allow a defrauded seller to recover any profits that the buyer has made on resale. See Bromberg, supra, at 226–27; Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); Zeller v. Bogue Electric Manufacturing Corp., 476 F.2d 795 (2d Cir.), cert. denied, 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973).

The Fifth Circuit has stated in Herpich v. Wallace, 430 F.2d 792, 810 (5th Cir. 1970):

"The gist of the Rule 10b–5 action for damages is economic injury to the plaintiff resulting proximately from the acts of the defendants which constitute a violation of the rule."

See also Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 303 F.2d 527, 533 (10th Cir. 1962); Wittner v. Ghen, [1964–66 Transfer Binder], CCH Fed.Sec.L.Rep. ¶ 91,623 (S.D.N.Y.1966); Madigan, Inc. v. Goodman, 357 F.Supp. 1331, 1333 (N.D.Ill.1973), rev'd on other grounds, 498 F.2d 233 (7th Cir. 1974).

■ A close reading of the cases relied upon by plaintiffs reveals no sup-

---

**6.** It is assumed *arguendo* that plaintiffs' limited partnership interests were securities, and that their sale, or purchase, was a "sale" or "purchase" of securities for purposes of Rule 10b–5. Fershtman v. Schectman, 450 F. 2d 1357 (2d Cir. 1971), cert. denied, 405 U.S.

1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972); Sultan v. Bessemer-Birmingham Motel Associates, 322 F.Supp. 86 (S.D.N.Y.1970); Lerman v. Tenney, 295 F.Supp. 780 (S.D.N.Y. 1969); Fox v. Prudent Resources Trust, 382 F.Supp. 81 (E.D.Pa.1974).

port for their claim that they are entitled to damages in a situation where no loss has been suffered and where a substantial gain has in fact been made. Initially, *Affiliated Ute, supra,* is not any authority for the proposition that plaintiffs are entitled to the difference between the fair value of what the seller received and what he would have received had there been no fraudulent conduct. *Affiliated Ute* did not abandon the "out of pocket loss" measure of 10b-5 damages. This yardstick was extended to award a plaintiff the defendant's profits resulting from a fraudulent purchase *if* those profits *exceeded* the plaintiff's "out of pocket loss." *See* Zeller v. Bogue Electric Manufacturing Corp., *supra,* 476 F.2d at 801; Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1304 (2d Cir. 1973). The District Court in *Affiliated Ute* had found that the white transfer agents had purchased the mixed-bloods' shares for less than fair value; the Supreme Court noted that "the defendants were in a position to gain financially from [the plaintiff's] sales." 406 U.S. at 153, 92 S.Ct. at 1472. The Court then stated that the measure of damages to be applied in that case was

"the difference between the fair value of all that the mixed-blood seller received and the fair value of what he would have received had there been no fraudulent conduct, . . . except for the situation where the defendant received more than the seller's actual loss. In the latter case damages are the amount of the defendant's profit." *Id.* at 155, 92 S.Ct. at 1473.

Plaintiffs also rely on the Tenth Circuit's opinion in Mitchell v. Texas Gulf Sulphur Co., 446 F.2d 90 (10th Cir.), cert. denied, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971). The damages awarded in *Mitchell* were the amount it would have taken a reasonable investor to *reinvest* in the TGS market within a reasonable time after he became aware of the true facts. Although this award was higher in fact than an "out of pocket" award would have been, the approach in *Mitchell* is not applicable in this case. The court was careful in *Mitchell* to warn that its computation of damages was not a uniform rule with broad application to all securities cases, *id.* at 105, and the Tenth Circuit has limited *Mitchell* to its facts. *See* Richardson v. MacArthur, *supra,* 451 F.2d at 43–44. While *Mitchell* is in probable conflict with Section 28(a), *see* The Measure of Damages in Rule 10b-5 Cases Involving Actively Traded Securities, 26 Stan.L. Rev. 371, 379 (1974); 49 Texas L.Rev. 1141 (1971), the conflict need not be resolved since the case before us does not involve a reinvestment situation.

Plaintiffs also misread Janigan v. Taylor, 344 F.2d 781 (1st Cir.), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L. Ed.2d 120 (1965). In *Janigan,* plaintiffs were former shareholders and corporate directors who had sold their shares to the former president of the company in reliance on the latter's representation concerning the future course of the corporation. The defendant purchased the shares for $40,000 and sold them two years later for $700,000. The court awarded his profit to the plaintiffs, stating:

"It may, as in the case at bar, be entirely speculative whether, had plaintiffs not sold, the series of fortunate occurrences would have happened in the same way, and to their same profit. However, there can be no speculation but that the defendant actually made the profit and, once it is found that he acquired the property by fraud, that the profit was the proximate consequence of the fraud, whether foreseeable or not. It is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them . . . it is simple equity that a wrongdoer should disgorge his fraudulent enrichment." Id. at 786.

To the same effect are Myzel v. Fields, 386 F.2d 718 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L. Ed.2d 1143 (1968), and *Affiliated Ute, supra*. However, those cases can have little application here where there is no allegation of wrongful profit and in fact substantial agreement exists that the defendants have not been enriched as a result of their allegedly fraudulent conduct and have no profits to disgorge.

Plaintiffs' final reliance is placed on Travis v. Anthes Imperial Ltd., 473 F.2d 515 (8th Cir. 1973). In *Travis,* the Eighth Circuit held that plaintiffs had standing to sue defendants under Rule 10b–5 where the plaintiffs alleged that the defendants' misrepresentations encouraged them to hold their stock until the defendants controlled the market in that stock. The plaintiffs in that case claimed that they "would have sold their stock earlier when a market . . . existed and the price was higher." *Id.* at 521. The facts in *Travis* do not reasonably lead to the conclusion that the plaintiffs enjoyed a net gain, as here, before instituting suit. Moreover, *Travis* does not support the standards for awarding damages which plaintiffs assert are applicable. *Travis* has consistently been read as a purchaser-seller case following either Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir.), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967) ("forced seller" exception); or Stockwell v. Reynolds & Co., 252 F.Supp. 215 (S.D.N.Y.1965) ("aborted seller" exception). *See, e. g.,* Smallwood v. Pearl Brewing Co., 489 F. 2d 579, 593 (5th Cir. 1974); Manor Drug Stores v. Blue Chip Stamps, 492 F.2d 136, 140 (9th Cir. 1973); In re Penn Central Securities Litigation, 367 F.Supp. 1158, 1173 (E.D.Penn.1973); Getter v. R. G. Dickinson & Co., 366 F. Supp. 559, 563–64 (S.D.Iowa 1973).

Based on my reading of the case law in this and in other circuits, I am confident that plaintiffs have suffered no actionable harm measurable in damages under Rule 10b–5. Fershtman v. Schectman, *supra,* involved a complaint alleging a variety of misrepresentations and nondisclosures in connection with a purchase of certain limited partnership interests and their subsequent "forced sale" upon the termination of the limited partnership. The court held that the facts did not give rise to a suit under Rule 10b–5 but rather supported a claim for reformation of the partnership agreement under state law. One ground on which the court relied for dismissing the complaint for want of jurisdiction was the absence of damages:

> "Beyond that the plaintiffs have suffered no damage from making their investments; rather they have reaped large profits." 450 F.2d at 1361.

The Second Circuit's decision in Levine v. Seilon, Inc., 439 F.2d 328 (2d Cir. 1971), also seems to preclude the rule of damages which plaintiffs advance. That case involved a 10b–5 claim by a former preferred stockholder of defendant. The plaintiff had alleged that the corporate defendant falsely represented that it would honor a commitment to give preferred shareholders the opportunity to exchange their stock for common stock. The market price for preferred stock rose to reflect the future exchange. The corporation never made the exchange; instead it redeemed the preferred stock. Plaintiff claimed that he was misled into retaining his stock in anticipation of the exchange, arguing that he was damaged because he could have sold the shares on the market at a substantially higher price than the redemption acquisition price which he ultimately received. In affirming dismissal of the 10b–5 action, the court summarized the rule of damages in 10b–5 cases as follows: a defrauded buyer can recover only the excess of what he paid over the value of what he received; a defrauded seller is allowed to recover not only the difference between the actual value and what he received at the time of sale, but also any additional profits which the fraudu-

lent buyer has actually realized or which the seller would have received had the seller held the stock for a reasonable time after disclosure.[7] The court found that the defendant had obtained no "enrichment" and received no windfall as a result of the redemption. In fact, the stockholders received "a good deal more" than what the stock was worth:

> "The plain fact is that save for the possibility of selling to an innocent victim, Levine lost nothing from Seilon's alleged fraud except the euphoria he doubtless experienced during the summer and fall of 1968. This does not constitute the 'actual damages,' see § 28(a), compensable under § 10(b) of the Securities Exchange Act or Rule 10b–5." *Id.* at 335.

Like Seilon, FBA has obtained no enrichment, and, like Levine, the Abrahamsons have not been damaged.

Wolf v. Frank, 477 F.2d 467 (5th Cir.), cert. denied, 414 U.S. 975, 94 S. Ct. 287, 38 L.Ed.2d 218 (1973), lends further support to defendants' motions. Plaintiffs purchased 37,500 shares in IGB Corporation for $75,000 in reliance on various representations made by defendants. Within six months of the purchase, plaintiffs had sold approximately 23,000 of their shares for $95,000. Plaintiffs sued the defendants individually and derivatively as stockholders of IGB, charging that the defendants had failed to fulfill their promises and alleging conduct generally violative of Rule 10b–5. The Court of Appeals agreed with the lower court's finding that the plaintiffs were not entitled to individual relief because they failed

to show any actual damages, since they had made a profit of roughly $20,000, over and above the value of the IGB shares which had been retained.

Moreover, a finding of profit is not even required to defeat an action for damages under Rule 10b–5; an absence of actual loss is sufficient. The District Court in Lewis v. Bogin, 337 F.Supp. 331 (S.D.N.Y.1972), granted summary judgment for defendants on plaintiff's 10b–5 suit attacking a consummated merger. The merger was conceivably in violation of the securities laws. However, plaintiff suffered no damage, and hence had no valid 10b–5 claim, where his stock commanded the same price before and after the merger. The court in Madigan, Inc. v. Goodman, *supra,* similarly granted defendant's motion for summary judgment where plaintiff sold his stock for approximately the same amount at which it was acquired. Since plaintiff suffered no loss, he had no cause of action under Rule 10b–5. Because plaintiffs have failed to establish actual damages here, their 10b–5 claim is fatally defective.[8]

3. *The Measure of Damages in a § 206 Claim Under the Investment Advisers Act*

█ Plaintiffs' final point is that any "out of pocket" limitation on a private suit under Rule 10b–5 is inappropriate in a damages action pursuant to Section 206 of the Investment Advisers Act of 1940. The principal basis for this argument appears to be the absence in the Act of any provision similar to Section 28(a) of the 1934 Act. No other authority is cited for this proposition.

---

7. Two years later the Second Circuit modified its statement in Levine and said that a defrauded buyer could also obtain, in addition to the usual measure of damages, windfall profits received by the defrauding party. *See* Zeller v. Bogue Electric Manufacturing Corp., *supra* n. 5.

8. The only case remotely *contra* is Stevens v. Abbott, Proctor & Paine, 288 F.Supp. 836 (E.D.Va.1968), where the court rejected the "out of pocket" rule as an appropriate mea-

sure of damages in a 10b–5 case alleging excessive churning. Net profit would not be an absolute defense to such an allegation when a court might reasonably award a plaintiff the commission charged by and paid to the broker defendant. In effect, such a defendant would be forced to disgorge profits resulting from fraudulent conduct violative of Section 10(b). As discussed earlier, there has been no allegation of defendants' enrichment due to the nondisclosure.

While the rule requiring actual damages in 10b–5 actions is not necessarily applicable to every situation involving the securities laws, *see, e. g.,* Voege v. Ackerman, 364 F.Supp. 72 (S.D.N.Y. 1973) (where proxies necessary for approval of merger were obtained in a materially misleading manner, the District Court might order an accounting to insure that the shareholders received the value that was represented as coming to them); Stevens v. Abbott, Proctor & Paine, 288 F.Supp. 836 (E.D.Va.1968), the few cases arising under the Investment Advisers Act do not suggest that the rule under Section 206, the antifraud provision, is any different. *See* Bolger v. Laventhol, Krekstein, Horwath & Horwath, 381 F.Supp. 260 (S.D.N.Y.1974); Courtland v. Walston & Co., Inc., 340 F.Supp. 1076 (S.D.N.Y.1972); Wiesenberger v. W. E. Hutton & Co., 35 F.R.D. 556 (S.D.N.Y.1964). These three cases involved alleged violations of both Section 206 and Rule 10b–5, and the *Bolger* and *Courtland* courts noted the obvious similarity between the language of the Section and the Rule, 381 F.Supp. at 268; 340 F.Supp. at 1083, a point with which plaintiffs are in express agreement. Plaintiffs' Reply Memorandum at 17. The *Courtland* decision also held at 1093 that an adequate measure of damages would be one "based on the monetary loss actually and proximately resulting from the acts complained of", language virtually identical to the words used in Section 28(a) of the Securities Exchange Act.

Finally, such an inconsistency between Rule 10b–5 and Section 206 would create an "unfortunate dichotomy" between the acts, *see* Globus v. Law Research Service, Inc., 418 F.2d 1276 (2d Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970); *Bolger, supra,* and no authority or persuasive rationale warrants reaching for such a conclusion.

In sum, as plaintiffs have shown no damages compensable under law, summary judgment is granted to all defendants.